# Illinois Official Reports

## Appellate Court

***Doe v. Bridgeforth*, 2018 IL App (1st) 170182**

| | |
|---|---|
| Appellate Court Caption | JANE DOE, Individually and as Parent and Next Friend of Doe Child, Plaintiff-Appellant, v. IDRIS BRIDGEFORTH and THE BOARD OF EDUCATION OF THE CITY OF CHICAGO, Defendants-Appellees. |
| District & No. | First District, Sixth Division<br>Docket No. 1-17-0182 |
| Filed | March 9, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-L-6805; the Hon. Thomas Lipscomb, Judge, presiding. |
| Judgment | Affirmed in part; reversed in part; remanded with instructions. |
| Counsel on Appeal | Romanucci & Blandin LLC, of Chicago (Bhavani Raveendran, of counsel), for appellant.<br><br>Law Department of Board of Education of the City of Chicago, of Chicago (Ronald L. Marmer and Lee Ann Lowder, of counsel), for appellee. |
| Panel | JUSTICE DELORT delivered the judgment of the court, with opinion. Justices Cunningham and Connors concurred in the judgment and opinion. |

**OPINION**

¶ 1    Doe Child, a student at Ashburn Community Elementary School (Ashburn) in Chicago, was sexually abused by defendant Idris Bridgeforth, an Ashburn faculty member.[1] After Bridgeforth's conduct was discovered, two legal proceedings ensued, one criminal and one civil. The criminal proceeding culminated with Bridgeforth's conviction for criminal sexual assault and aggravated criminal sexual assault. See *People v. Bridgeforth*, 2017 IL App (1st) 143637. The civil proceeding, which is the subject of this appeal, commenced when J.E.'s mother, Jane Doe, sued Bridgeforth for damages under several tort theories and the Board of Education of the City of Chicago (CPS) for willful and wanton conduct. The case proceeded to trial on (1) the willful and wanton conduct claim against CPS and (2) damages against Bridgeforth. The jury returned verdicts in favor of CPS and Bridgeforth.

¶ 2    Jane Doe's principal contention on appeal is that she is entitled to judgment *n.o.v.* on the willful and wanton conduct claim because she produced overwhelming evidence establishing that CPS was deliberately indifferent to J.E.'s safety. She also maintains that she is entitled to a new trial because (1) CPS's attorney misstated the law during closing argument, (2) the jury instructions and verdict forms were inaccurate and confusing, and (3) the jury ignored "proven elements of damages." We affirm in part, reverse in part, and remand.

¶ 3                                    BACKGROUND

¶ 4    On June 18, 2012, Jane Doe, on behalf of herself and of her daughter J.E., filed this lawsuit against Bridgeforth and CPS. The complaint, as later amended, contained five counts. Counts I through III were for battery, negligent infliction of emotional distress, and intentional infliction of emotional distress, respectively. These counts were brought against Bridgeforth, a CPS employee who coached J.E.'s basketball and track and field teams.

¶ 5    Count IV, against CPS, was for willful and wanton conduct. It alleged that between August 1, 2009, and June 7, 2012, Bridgeforth transported J.E. to and from basketball and track and field games and practices using his personal vehicle. Count IV further alleged that, between December 1, 2011, and June 7, 2012, Bridgeforth repeatedly sexually assaulted J.E. while she was alone with him in his vehicle and sent her numerous sexually charged text messages. Jane Doe alleged that CPS engaged in willful and wanton conduct by, among other things, "fail[ing] to stop *** Bridgeforth from harming [J.E.] when they knew that Bridgeforth was repeatedly alone with [J.E.] in his vehicle which was a known violation of CPS policy."

¶ 6    Bridgeforth was served but never appeared in the circuit court and was defaulted before trial. When trial began, the judge told the jury, "[i]t has been judicially determined that [Bridgeforth] committed the acts the Plaintiff alleged." And, when the court instructed the jury after the close of evidence, it told the jury that it had "found" Bridgeforth "liable" and that CPS "is not to be prejudiced by the fact that the liability of *** Bridgeforth is no longer at issue."

¶ 7    Because of the nature of the issues presented, we must recite the trial evidence in unusual detail. At trial, Jane Doe testified that on the morning of June 6, 2012, she saw several sexually charged text messages on an iPod device J.E. had been using. Jane Doe recognized that the

---

[1]In the criminal case, this court referred to Doe Child as "J.E." For consistency, we will refer hereinafter to her in the same manner.

sender's phone number was Bridgeforth's. In the texts, Bridgeforth stated that he loved J.E. and wanted to have sexual intercourse with her. After viewing the texts, Jane Doe went to Ashburn, where she met with Jewel Diaz, the school principal. Shortly afterwards, J.E. arrived at Ashburn and joined the meeting. When asked about the texts, J.E. at first said they "were from [Bridgeforth's] daughter's friend that was a guy." Jane Doe became upset and left the meeting because "[J.E.] was covering up for [Bridgeforth]."

¶ 8     Jane Doe testified that she was unaware that CPS had a transportation policy that required faculty to obtain written permission before using their private vehicles to transport students. She stated that she would have given Bridgeforth written permission to transport J.E. in his personal vehicle had he requested it. However, she testified that "there would be no reason for him to ride alone" with J.E. because "there's a whole team." She further testified that it would have been suspicious for Bridgeforth to ask permission to drive alone with J.E.

¶ 9     On cross-examination, Jane Doe testified that she had an arrangement with Bridgeforth to drive J.E. home after practices when she was not available. She admitted that she "knew that there were times that [he] was bringing" J.E. home. She explained, however, that she "was under the assumption that he was bringing the whole team." Jane Doe admitted that she "never had any suspicion" about Bridgeforth; if she did, she would not have allowed Bridgeforth to give J.E. rides home.

¶ 10    J.E. testified that she attended Ashburn from kindergarten through eighth grade. She was on the track team from fifth to eighth grade, and the basketball team from sixth to eighth grade. Bridgeforth coached both teams. When a team had an away game, the coaches, including Bridgeforth, would transport the players, including J.E., to and from the game. In addition, Bridgeforth also transported J.E. home from practices. She explained that she was often alone with Bridgeforth during these rides.

¶ 11    When J.E. was in eighth grade, Bridgeforth began engaging in a course of sexual misconduct during their car rides. In one incident, Bridgeforth touched J.E.'s inner thigh and chest. Later, while driving J.E. home from a weekend track meet, Bridgeforth felt J.E.'s inner thigh and inserted his finger into her vagina, which J.E. testified was physically painful. In addition, Bridgeforth (1) frequently kissed J.E., (2) tried to coerce her into performing fellatio on him by "pull[ing] my head down into his lap," (3) asked J.E. to have sexual intercourse with him, and (4) fondled himself in front of her.

¶ 12    On June 6, 2012, Jane Doe discovered the text messages that Bridgeforth had sent to J.E. That day, when J.E. arrived at school, she was called into a meeting with Principal Diaz and Jane Doe, where she was asked about Bridgeforth's abuse. J.E. asked to speak to Megan McKay, one of her teachers. J.E. told McKay that Bridgeforth touched her inappropriately.

¶ 13    On cross-examination, J.E. testified that Bridgeforth was well liked at Ashburn and did not have a reputation for "doing inappropriate things." She explained that often when Bridgeforth gave her rides, other children were already in the car. Although J.E. did not know if her mother had given Bridgeforth permission to drive her, she stated that her mother knew that Bridgeforth was taking her home.

¶ 14    Denise Sklenar, a school clerk at Ashburn, testified that CPS had a written transportation policy. The policy, which was read into the record during her testimony, prohibited CPS faculty from using their personal vehicles to transport students unless the faculty member had written permission from the school principal and the student's parent or guardian. Sklenar

stated that the policy was enacted "for the safety of the children who go to Ashburn" and to prevent CPS employees from having the opportunity to abuse or assault students.

¶ 15    On cross-examination, Sklenar testified that she never heard Bridgeforth say anything lewd or inappropriate. Sklenar then testified that she did not have any reason to suspect that Bridgeforth would sexually assault J.E.

¶ 16    Tonya Rippy, a teacher at Ashburn, testified that one of the reasons for CPS's transportation policy was to ensure student safety. She agreed that if a teacher transported a student in his or her private vehicle without parental permission, the teacher would be violating the policy and putting the student at risk.

¶ 17    Thereafter, she testified that she was a friend of Jane Doe and that they had a private, verbal agreement for Rippy to drive J.E. to and from school when Jane Doe was unavailable. She did not think written permission was necessary because she was "not wearing [her] teacher hat." She testified that other Ashburn faculty members saw her driving J.E., but that no one ever asked her if she had written permission from Jane Doe. Likewise, Rippy saw Bridgeforth driving students, including J.E., but she never asked if he had permission because she "assumed that permission was granted."

¶ 18    On cross-examination, Rippy testified that Jane Doe was aware that Bridgeforth was driving J.E. She recalled a conversation in which Jane Doe said, "[d]on't worry about her, she has a game. She's going to be coming home with [Bridgeforth]." Rippy understood this to mean that Jane Doe had given Bridgeforth permission to drive J.E. Rippy testified that she never heard Bridgeforth say anything sexual or inappropriate, and that nothing about Bridgeforth stood out in her mind as a "red flag" that she "should have caught in hindsight."

¶ 19    Leroy Martin, a special education teacher at Ashburn, testified that he coached Ashburn's football team with Bridgeforth. He stated that if he saw a student getting into a faculty member's private vehicle, he would "probably" ask a superior if the faculty member had permission to transport the student. He explained that a faculty member who saw a student in another faculty member's vehicle and did not "ask any questions" would be "making a decision to not act with regard for the safety of the child." He stated that if he saw a child getting into a faculty member's vehicle, he would investigate because "that would raise a red flag." Martin then testified that at the time of trial, he had recently transported students to a game in his personal vehicle even though he did not have written permission. He explained that "it was a last-minute thing ***. The game was that day, and we didn't have any buses that day."

¶ 20    On cross-examination, Martin testified that during the 2011-12 school year, he never saw J.E. get into Bridgeforth's vehicle. He stated that he never heard Bridgeforth say anything sexual, lewd, or improper, and he testified that Bridgeforth never did anything or said anything that, in hindsight, raised a "red flag about what happened to [J.E.]"

¶ 21    Deidra Richardson testified that she was a teacher at Ashburn. She testified that the transportation policy was put in place to ensure student safety and that policy violations always need to be reported "because we want to keep children safe." On cross-examination, Richardson testified that she never saw any student, including J.E., getting into Bridgeforth's vehicle. She stated that she never heard Bridgeforth say anything that was lewd or sexual in nature. She stated that, in hindsight, nothing about Bridgeforth stood out to her as "red flag." She testified, "[w]hen I was told the news, I was *** stunned. I was literally stunned." Upon

further direct examination, she explained that she was stunned because she "had no idea that [Bridgeforth] was the type of person that was working at the school to do something to [J.E.]"

¶ 22 Megan McKay testified that she was a teacher at Ashburn. When J.E. was in the sixth grade, McKay was her science and homeroom teacher. McKay stated that at some point before June 2012, J.E. told her that Bridgeforth was transporting her in his private vehicle. McKay acknowledged that she did not ask J.E. or Principal Diaz if Jane Doe had given Bridgeforth permission to transport J.E.

¶ 23 On June 6, 2012, McKay was called to the school office and asked to speak to J.E. about an incident involving Bridgeforth. McKay explained that J.E. specifically asked to speak to her because she trusts McKay and felt safe with her. McKay explained that J.E. initially could not speak because she was crying. Once J.E. regained her composure, she told McKay that she had been texting with Bridgeforth for "months." When McKay asked J.E. if Bridgeforth touched her "down there," J.E. "started crying uncontrollably."

¶ 24 On cross-examination, McKay explained that she did not follow up when J.E. told her about the rides because "[i]t didn't seem like it was out of the ordinary and it was a weekend" and she knew that Bridgeforth and Jane Doe were friends. She stated that she "assumed that there was an arrangement made as friends especially since it was the weekend." Thereafter, the following colloquy ensued:

"Q. You testified a bit ago that you said yes and no when you were asked *** whether you felt that the school had failed to protect *** [J.E.]

A. I think that everybody trusted him. When you trust someone with your child, you know, there is a—I want to say permission given to hey, yeah, can you pick her up, do this for me, and that trust was violated. ***

Q. But there were no red flags that you were aware of?

A. No, there were no red flags.

Q. You were shocked when all of this came to light[,] right?

A. Yes, very.

Q. So is it fair to say then there was nothing that you could have done even with the benefit of hindsight?

A. No, there was nothing I could have done.

Q. *** Was there anything that Bridgeforth said that was lewd or inappropriate—

A. No.

Q. —at any point in time?

A. No. Not at all.

Q. Was there anything that you felt like that you could have done to have prevented this incident?

A. Not then, no.

Q. Was there anything that you felt like anybody else at Ashburn, any other employees, your friends or colleagues could have done to have prevented this incident?

A. No.

Q. So what I am gathering from you is that Bridgeforth is the culprit and there is nothing that you or the school could have done, is that right?

A. That is right."

¶ 25    Jewel Diaz, Ashburn's principal, testified that before June 6, 2012, she was not aware that students were receiving rides to and from games from coaches and that she never witnessed a student getting into a coach's private vehicle. On cross-examination, Diaz testified that she never heard Bridgeforth say anything lewd, sexual, or inappropriate. She stated that she never disciplined Bridgeforth and that she was unaware that Bridgeforth and J.E. had exchanged phone numbers.

¶ 26    Ezra Townsend testified that he was a special education classroom assistant and coach at Ashburn. Townsend testified that he saw Bridgeforth transporting J.E. in his private vehicle on five occasions. He acknowledged that despite seeing J.E. in Bridgeforth's vehicle, he never asked Diaz or Jane Doe if Bridgeforth had permission to drive J.E. Townsend described a time when Bridgeforth was giving Townsend, J.E., and some other students a ride home. According to Townsend, he needed to be taken to the suburbs, and J.E. lived near Ashburn. However, rather than drop J.E. off first, Bridgeforth drove to the suburbs to drop Townsend off. Townsend asked Bridgeforth why he was not dropping J.E. off first. According to Townsend, Bridgeforth "said [J.E.] was going with me by her people house that live out by me [*sic*]."

¶ 27    Bridget Connolly testified for Jane Doe as a controlled expert in the field of educational administration. Connolly reviewed the CPS transportation policy and stated that its purpose was to "ensure the safety and well being of students[ ]" and "make sure there is a uniform practice on transportation for the district." She opined that one of the policy's goals was to prevent student sexual abuse. Connolly testified that Ashburn's faculty violated the transportation policy "on a consistent basis," which in her opinion was "a cause of J.E.'s sexual abuse and sexual assault." She testified that CPS broke its own rules when Bridgeforth drove J.E. because he did not have written permission from Jane Doe or Diaz. She opined that CPS had notice that Bridgeforth was driving J.E. because Townsend, McKay, Diaz, and Richardson knew Bridgeforth was giving J.E. rides. She noted that despite this, no one ever reported Bridgeforth's conduct to a school administrator.

¶ 28    Thereafter, Jane Doe's attorney asked Connolly if she had "an opinion to a reasonable degree of educational administrative certainty as to whether CPS blatantly disregarded" J.E.'s safety. In response, Connolly testified, "I believe that they violated the travel policy and that put the child in direct harm. I believe that they were aware that the policy violations were occurring over time." Connolly was then asked whether she had "an opinion as to whether Mr. Townsend specifically and blatantly disregarded" J.E.'s safety. In response, she testified, "I believe that his silence of not reporting the transportation of J.E. in a private vehicle by herself put her at risk." Upon further direct examination, Connolly opined that CPS "blatantly ignored the safety of [J.E.]"

¶ 29    Dr. Emily Arnstein testified that in August 2012, she was a clinical extern at Chicago Children's Advocacy Center (CCAC), during which time she treated J.E. for "complex trauma from being sexually assaulted." Dr. Arnstein testified to a reasonable degree of psychological certainty that (1) the abuse J.E. experienced was affecting her functioning and (2) J.E. experienced "psychological pain." In addition, she opined that it was "possible" that the abuse J.E. experienced "could have a long-lasting impact."

¶ 30    On cross-examination, Dr. Arnstein testified that she attempted to evaluate J.E. using a trauma symptom checklist. However, because J.E. was underreporting her symptoms, Dr. Arnstein "could not consider it a valid profile." She later testified that she was unable to opine to a reasonable degree of psychological certainty that J.E. sustained trauma from the sexual

abuse. She acknowledged that in notes she took during J.E.'s therapy sessions, she described J.E.'s mood as "euthymic," meaning, "a normal mood in which the range of emotions is neither depressed nor highly elevated." Upon further examination, Dr. Arnstein explained, "[d]ue to the high score in the underreporting scale, [J.E.] may have been in denial or may not have been reporting them."

¶ 31 Dr. Myra West, another of Jane Doe's controlled experts, testified to a reasonable degree of psychological certainty that J.E. experienced pain, suffering, and emotional distress and that it was "definitely possible" and "more likely than not" that J.E. would have a "future psychological effect" due to Bridgeforth's abuse. In addition, Dr. West testified to a reasonable degree of psychological certainty that J.E. "more likely than not" experienced trauma due to Bridgeforth's abuse and that J.E. "will continue to experience emotional pain as a result of what happened."

¶ 32 CPS then presented its case-in-chief, beginning with the video deposition of its controlled expert, Dr. Robert Galatzer-Levy. Dr. Galatzer-Levy testified that he disagreed with Dr. West's conclusion that J.E. was "psychologically damaged" by Bridgeforth's abuse. He explained that Dr. West's report "nowhere states that any particular symptom was caused by [J.E.] being abused, nor does she anywhere state that it is more likely than not that [J.E.] will develop *** any particular symptom." Dr. Galatzer-Levy stated that there was "no data that supports and no even opinion that supports her ultimate opinion. She keeps referring to things that may happen, that are possible, but something that may happen or is possible is not the same as something that is more likely than not to happen."

¶ 33 Dr. Galatzer-Levy then opined that J.E. did not suffer psychological damage. He based that conclusion on a number of factors. First, he noted that J.E. "nowhere states that she had any psychiatric symptoms whatever." Second, he stated that, although Jane Doe had noted that J.E. was becoming irritable, "those symptoms occurred *** before the onset of the sexual abuse." Third, he stated that, while Jane Doe and J.E. were having trouble getting along, that was "not at all atypical of 13-year old girls in relationship to their mother." Fourth, he noted that Jane Doe and J.E. both reported that J.E. was "in other respects doing quite well psychologically." Finally, he noted that, "in terms of [Dr. Arnstein's] observations and [J.E.'s] statements to [Dr. Arnstein], there was no indication of any illness or pathology."

¶ 34 In addition, Dr. Galatzer-Levy testified that he did not believe J.E. was underreporting her symptoms. He explained that because J.E. was "able to recall most of the event," her "failure to recall or reluctance to talk about the material is not itself a significant symptom." He then testified to a reasonable degree of medical and psychiatric certainty that J.E. "will never develop psychiatric symptoms as a result of having been abused." He explained that most children who are sexually abused "do not later develop symptoms." With specific reference to J.E., he explained that "the children who are most likely to develop symptoms later develop them early, and this child has an—essentially an absence of symptoms immediately following the abuse."

¶ 35 On cross-examination, Dr. Galatzer-Levy testified that he was not aware that Bridgeforth (1) stated he felt J.E.'s pubic hair through her pants, (2) exposed his penis to J.E. and masturbated in front of her, (3) grabbed J.E.'s head to try to force her to perform oral sex on him, and (4) inserted his fingers into J.E.'s vagina. However, he testified that knowing that information would not have changed any of his opinions. Dr. Galatzer-Levy acknowledged that J.E. cried for approximately 30 minutes when she spoke to McKay, which he stated was a

symptom of emotional distress. When asked what caused J.E.'s distress, Dr. Galatzer-Levy stated, "she might have been very distressed at simply recounting these events rather than by the events themselves."

¶ 36 Dr. Brandon Suarez testified that he was a clinical supervisor at CCAC, where he supervised Dr. Arnstein when she was a clinical extern. Dr. Suarez stated that he reviewed and approved Dr. Arnstein's treatment notes and observed one of her sessions with J.E. During his examination, CPS's attorney asked Dr. Suarez if he could opine to a reasonable degree of psychological certainty whether J.E. sustained trauma from the sexual assault. After counsel clarified the question, Dr. Suarez stated, "it's hard for me to say anything definitively." He explained:

"I think that because there was a high level of defensiveness, it's hard for me to say anything definitively. Because without further assessment and further time *** as well—because a lot of children, they don't always show the symptoms of trauma immediately within 20 sessions, which could be a few months."

¶ 37 During CPS's closing argument, the following colloquy occurred:

"Townsend—he's known this family since she was a baby. You have to ask yourself growing up with [J.E.], do you think that man would have intentionally with conscious disregard or utter—

MR. MARASSO: Objection as to intentional.

THE COURT: Overruled.

MR. LAMANTIA: With conscious disregard or utter indifference do anything to hurt her or put her in a position to be hurt?"

¶ 38 During the jury instruction conference, CPS propounded a modified version of Illinois Pattern Jury Instructions, Civil, No. 36.01 (2011) (hereinafter IPI Civil No. 36.01), which the court tendered to the jury over an objection by Jane Doe. It read: "If you decide for the defendant Board of Education of the City of Chicago on the question of liability, you will have no occasion to consider the question of damages, as to the Board of Education of the City of Chicago." The court also tendered to the jury a modified version of IPI Civil No. 41.03, which read:

"The rights of the defendants Board of Education of the City of Chicago and Idris Bridgeforth are separate and distinct. Each is entitled to a fair consideration of his own defense and you will decide each defendant's case separately as if it were a separate lawsuit. Each defendant's case must be governed by the instructions applicable to that case."

¶ 39 The court also tendered three verdict forms and a special interrogatory to the jury. Verdict Form A had three sections. The first section listed Bridgeforth and CPS on separate lines and allowed the jury to check "yes" or "no" to indicate whether or not the jury had found in favor of Jane Doe against each particular defendant. The second section asked the jury to assess damages for J.E.'s (1) pain and suffering, (2) loss of normal life, and (3) emotional distress. The third section asked the jury to apportion fault, in a way that equaled 100%, between Bridgeforth and CPS. Verdict forms B and C allowed the jury to "find for" CPS and Bridgeforth, respectively, and against Jane Doe. The special interrogatory asked: "Did the action or failure to act by the Board of Education of the City of Chicago show an utter indifference or conscious disregard for the safety of [J.E.]?"

¶ 40    When the jury announced it had reached a verdict, it had not answered the special interrogatory, so the court directed the jury to continue deliberating. When the jury returned, it had filled out verdict form B finding in favor of CPS and answered "no" to the special interrogatory. The court instructed the jury to complete verdict form A and ordered the jurors back to the jury room. After a third round of deliberations, the jury returned with verdict form A filled out as follows: in section one, the jury found in favor of (1) Jane Doe against Bridgeforth and (2) CPS against Jane Doe; in section two, the lines where the jury could assign damages were left blank; and in section three, the jury found Bridgeforth 100% at fault. Jane Doe moved for a mistrial and asked that the jury be polled. During jury polling, one juror answered, "I need clarification on it." After the court explained the polling question, the juror answered "yes." At the close of proceedings, the court entered judgment on the jury's verdict. Jane Doe filed a posttrial motion for judgment *n.o.v.* and new trial, which the court denied. This appeal followed.

¶ 41                                    ANALYSIS
¶ 42                          I. Willful and Wanton Conduct
¶ 43    We first consider Jane Doe's argument that she is entitled to judgment *n.o.v.* on her willful and wanton conduct claim against CPS. A motion for judgment *n.o.v.* presents "a question of law as to whether, when all of the evidence is considered, together with all reasonable inference from it in its aspect most favorable to the party against whom the motion is directed, there is a total failure or lack of evidence to prove any necessary element of the plaintiff's case or the defendants' defense." *Heideman v. Kelsey*, 414 Ill. 453, 457 (1953). This is an imposing standard. As the supreme court has explained, "[j]udgment notwithstanding the verdict should not be entered unless the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 109 (1997).

¶ 44    Section 3-108(a) of the Local Governmental and Governmental Employees Tort Immunity Act (Act) provides:

> "Except as otherwise provided in this Act, neither a local public entity nor a public employee who undertakes to supervise an activity on or the use of any public property is liable for an injury unless the local public entity or public employee is guilty of willful and wanton conduct in its supervision proximately causing such injury." 745 ILCS 10/3-108(a) (West 2012).

The Act defines "willful and wanton conduct" as

> "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property. This definition shall apply in any case where a 'willful and wanton' exception is incorporated into any immunity under this Act." *Id.* § 1-210.

¶ 45    Willful and wanton conduct is "an aggravated form of negligence," not an independent tort. *Jane Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 2012 IL 112479, ¶ 19. "[T]o recover damages based on willful and wanton conduct, a plaintiff must plead and prove [(1)] the basic elements of a negligence claim" and (2) that the defendant's conduct

demonstrated "a deliberate intention to harm or a conscious disregard for the plaintiff's welfare." *Id.*

¶ 46 "[W]illful and wanton conduct differs from mere negligence in that it 'requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man.' " (Internal quotation marks omitted.) *Barr v. Cunningham*, 2017 IL 120751, ¶ 20 (quoting *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 148 Ill. 2d 429, 449, (1992)). "Illinois courts define willful and wanton conduct, in part, as the failure to take reasonable precautions after knowledge of impending danger." (Internal quotation marks omitted.) *Id.*; see *Lynch v. Board of Education of Collinsville Community Unit District No. 10*, 82 Ill. 2d 415, 429 (1980) (" 'A willful or wanton injury must have been intentional or the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others ***.' " (quoting *Klatt v. Commonwealth Edison Co.*, 33 Ill. 2d 481, 488 (1965))). "To establish willful and wanton conduct in the absence of evidence of prior injuries," the plaintiff must produce, "[a]t a minimum, some evidence that the activity is generally associated with a risk of serious injuries." *Barr*, 2017 IL 120751, ¶ 21.

¶ 47 Based on these rules, our analysis can be distilled into two discrete inquiries. The first is whether Jane Doe established that the act of permitting a teacher to transport a student to and from athletic team practices and games in his private vehicle is "generally associated with the risk of serious injuries," in this case, teacher-on-student sexual assault. The second is whether Jane Doe established that CPS "knew," merely by virtue of various staff members knowing that J.E. was receiving rides from Bridgeforth, that J.E. was under an impending danger of sexual assault.

¶ 48 With respect to the first inquiry, Jane Doe's evidence was plainly insufficient. To be sure, Jane Doe did elicit testimony from Sklenar and Connolly to the effect that CPS enacted the transportation policy to prevent sexual assault incidents. But this testimony had little value. The transportation policy does not say its purpose is to prevent sexual assault. It does not actually mention or refer to sexual assault at all. Moreover, although CPS did not object to this aspect of Sklenar and Connolly's testimony, its admissibility is questionable because Jane Doe did not establish a foundation for Sklenar's or Connolly's testimony that the prevention of teacher-on-student sexual assault was one of the goals that motivated CPS to promulgate the transportation policy.

¶ 49 Foundation is the cornerstone of admissibility. See Ill. Rs. Evid. 701 (lay witnesses) ("If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness ***."), 703 (eff. Jan. 1, 2011) (expert witnesses) ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing."). Sklenar was a school clerk at Ashburn. She was not an administrator at CPS, and she never said that she had a role drafting or promulgating the transportation policy or that she had otherwise acquired firsthand knowledge of what transpired during the CPS proceeding wherein the policy was adopted. The same is true for Connolly, Jane Doe's expert. Although an expert witness is entitled to testify to his or her opinion so long as the opinion is made to a reasonable degree of certainty in the expert's chosen field, experts, like their lay counterparts, are nevertheless prohibited from engaging in guesswork or conjecture. See Ill. R. Evid. 703 (eff. Jan. 1, 2011); *Kinsey v. Scott*,

124 Ill. App. 3d 329, 340 (1984) ("An expert witness may not base his opinion upon conjecture, speculation, or a guess."). Here, Connolly did not even work for CPS, and like Sklenar, never testified to any facts or circumstances that could have established that she had knowledge, first-hand or otherwise, of CPS's motivations in promulgating the policy.[2] Thus both Sklenar's and Connolly's testimony on this point was little more than an exercise in speculation. While CPS did not object to this testimony, a rational juror could have easily sensed the fragility of this testimony and simply afforded it no weight.

¶ 50    And even if the jury did credit this testimony, it would still not have been enough to establish willful and wanton conduct by CPS. In application, the "generally associated" inquiry boils down to whether the action at issue was inherently or obviously dangerous. Our supreme court's recent opinion in *Barr* is instructive on this point. In *Barr*, the plaintiff sued his gym teacher and school board after he suffered an eye injury while playing floor hockey during gym class. 2017 IL 120751, ¶ 3. The plaintiff alleged that the teacher engaged in willful and wanton conduct by failing to require the students to wear protective eyewear. *Id.* In the midst of trial, the circuit court entered a directed verdict in favor of both defendants. This court reversed, reasoning that the teacher's failure to require protective eyewear could be considered by a jury as evidence of willful and wanton conduct. *Id.* ¶ 10.

¶ 51    The supreme court disagreed with this result. The court began its analysis by discussing *Murray v. Chicago Youth Center*, 224 Ill. 2d 213 (2007), and *Hadley v. Witt Unit School District 66*, 123 Ill. App. 3d 19 (1984), two cases where the plaintiff produced enough evidence to raise a triable issue of fact with respect to the "generally associated" inquiry. *Barr*, 2017 IL 120751, ¶ 21. In *Murray*, a student suffered a severe spinal injury while using a trampoline during an extracurricular activity. *Murray*, 224 Ill. 2d at 246. The court found that "the defendants' failure to take adequate safety precautions in light of their knowledge of the *inherent dangers of the activity* raised genuine issues of material fact on the question of willful and wanton conduct." (Emphasis added.) *Barr*, 2017 IL 120751, ¶ 21 (citing *Murray*, 224 Ill. 2d at 246). In *Hadley*, a student was injured in an industrial arts class. The evidence showed that the injured student and three friends "attempted to pound a piece of scrap metal through a hole in an anvil," that the student's teacher "observed the boys' activity but did not tell them to stop or instruct them to put on safety goggles," and that "[a]fter about 20 minutes, a metal chip flew into plaintiff's eye, causing trauma and visual impairment." *Id.* ¶ 22 (citing *Hadley*, 123 Ill. App. 3d at 20). A panel of this court "held that the teacher's failure to act after observing the students engaging in a 'dangerous activity' could constitute willful and wanton conduct." *Id.*

¶ 52    The *Barr* court then drew a distinction between the evidence the plaintiff introduced at trial and the facts of *Murray* and *Hadley*. It explained:

> "In contrast to *Murray* and *Hadley*, there was no evidence presented at trial that floor hockey played with plastic hockey sticks and squishy balls is an obviously dangerous activity. Plaintiff failed to introduce evidence of any particular dangers associated with floor hockey that called for the use of protective eyewear by students. Thus, plaintiff failed to meet his burden of proving that defendants knew or had reason to know that he could be seriously injured from playing floor hockey without safety goggles." *Id.* ¶ 23.

---

[2] At trial, Connolly testified that to prepare her opinions, she reviewed CPS's policies, unspecified depositions, and some unidentified "supplemental materials."

¶ 53    The evidence Jane Doe marshaled at trial in this case is similarly insufficient. Simply put, Jane Doe did not introduce any evidence whatsoever that could have established a causal link or relationship between (1) a school district allowing teachers to transport students in their personal vehicles and (2) teacher-on-student sexual assault, which thus put CPS on notice as to the danger J.E. was facing. Rather, her sole evidence on this point was Sklenar's and Connolly's testimony about why CPS promulgated the policy, which, as we explained, lacked foundation. Based on the evidence Jane Doe introduced at trial, a rational juror could have easily rejected the proposition that permitting a teacher to use his or her personal vehicle to transport a student to or from a school-approved event is necessarily or "generally associated" with teacher-on-student sexual assault.

¶ 54    Jane Doe fares no better on the second inquiry, *i.e.*, showing that CPS knew—merely because several of its employees were aware that J.E. was receiving rides from Bridgeforth—that J.E. was under an impending danger of sexual assault. Once again, *Barr* is instructive. In *Barr*, the court faulted the plaintiff for failing to introduce evidence showing that the defendants "were aware of facts which would have put a reasonable person on notice of the risk of serious harm from the activity." *Id.* ¶ 24. Here, Jane Doe proved at best that CPS knew Bridgeforth was violating the transportation policy by giving J.E. rides in his private vehicle without written permission from Diaz and Jane Doe. But the record contains no support for Jane Doe's conclusion that that evidence was sufficient to prove that CPS was on notice that J.E. faced an impending danger of sexual assault from Bridgeforth.

¶ 55    In fact, the evidence at trial proved the exact opposite, namely that no one at Ashburn had any reason whatsoever to suspect that J.E. was not safe with Bridgeforth. Virtually every CPS employee who testified at trial stated one way or another that Bridgeforth's behavior did not display any red flags that could have "disclose[d] *** to any reasonable man" the danger which J.E. was facing. (Internal quotation marks omitted.) *Id.* ¶ 20 (quoting *Burke*, 148 Ill. 2d at 449); see *id.* ¶ 24 (willful and wanton conduct requires proof that the "defendants were aware of facts which would have put a reasonable person on notice of the risk of serious harm from the activity"). Sklenar stated that she "did not" have any reason to suspect Bridgeforth and that, if she did, "it would have been addressed immediately." Rippy, who was a friend of Jane Doe, testified that there were was nothing about Bridgeforth that stood out as something she "should have caught in hindsight." Martin, who coached football with Bridgeforth, testified that Bridgeforth never did or said anything that raised a "red flag about what happened to [J.E.]" Similarly, Richardson testified that there were no "red flags" with Bridgeforth, and she stated that she was "literally stunned" when she found out what happened because she "had no idea that [Bridgeforth] was the type of person that was working at the school to do something to [J.E.]" Likewise, McKay—the teacher J.E. sought out during the June 6 meeting—testified that "there were no red flags," "there was nothing I could have done," and that Bridgeforth was the real culprit and that there was nothing she or anyone else at Ashburn could have done to prevent Bridgeforth from abusing J.E. Diaz, for her part, testified that (1) she never heard Bridgeforth say anything lewd, sexual, or inappropriate, (2) she never disciplined Bridgeforth, and (3) she was unaware that Bridgeforth and J.E. had exchanged phone numbers. Even Jane Doe testified that she "never had any suspicion" about Bridgeforth and that she would have given Bridgeforth permission to drive J.E. had he formally requested it.

¶ 56    The bottom line is this: willful and wanton conduct "requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man." (Internal quotation marks omitted.) *Id.* ¶ 20. Jane Doe never introduced any evidence that could have proven that anyone at CPS (1) knew J.E. was in serious danger of being sexually assaulted because Bridgeforth was transporting her in his personal vehicle or (2) knew of facts that would have disclosed that danger. Simply put, at trial Jane Doe failed to establish why anyone at CPS should have been able to deduce that Bridgeforth would sexually assault J.E. simply by knowing he was giving her rides in his personal vehicle. Thus, a rational jury could have found against Jane Doe on her willful and wanton conduct claim. The circuit court correctly denied Jane Doe's motion for judgment *n.o.v.* on her willful and wanton conduct claim against CPS.

¶ 57    Although it was a prominent feature of Jane Doe's theory of the case, the fact that CPS violated the transportation policy when Bridgeforth gave J.E. rides does not compel us to reach a different conclusion. It is well established that "a public entity's violation of its own internal rules does not constitute proof of negligence, much less willful and wanton conduct." *Floyd v. Rockford Park District*, 355 Ill. App. 3d 695, 702 (2005); see *Young v. Forgas*, 308 Ill. App. 3d 553, 566 (1999) ("Internal rules and procedures *** do not impose a legal duty upon municipal entities and their employees."). And even if evidence the policy was violated could be used to support Jane Doe's claim, she would still not be entitled to judgment *n.o.v.* At trial, Jane Doe's evidence that the policy violation caused J.E.'s injury came in through Connolly, who testified that CPS "blatantly ignored the safety of [J.E.]" when its agents observed her in Bridgeforth's vehicle in violation of the policy and did nothing to investigate or intervene. But that testimony could not have advanced Jane Doe's claim. "Willful and wanton" denotes "a range of *mental states*, from actual or deliberate intent to cause harm, to conscious disregard for the safety of others or their property, to utter indifference for the safety or property of others." (Emphasis added.) *Harris v. Thompson*, 2012 IL 112525, ¶ 41. Connolly's testimony that CPS "blatantly" disregarded J.E.'s safety did not fall within any of the mental states embodied in the definition of willful and wanton conduct. Indeed, "blatantly" is not even a mental state.

¶ 58                    II. New Trial: Verdict Against the Manifest Weight of the Evidence

¶ 59    We next consider Jane Doe's argument that she is entitled to a new trial because the jury's verdict in favor of CPS on her willful and wanton conduct claim was against the manifest weight of the evidence. " '[O]n a motion for a new trial a court will weigh the evidence and set aside the verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence.' " *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992) (quoting *Mizowek v. De Franco*, 64 Ill. 2d 303, 310 (1976)). "A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary, and not based upon any of the evidence." *Wardwell v. Union Pacific R.R. Co.*, 2017 IL 120438, ¶ 11. "[T]he determination of whether a new trial should be granted rests within the sound discretion of the trial court, whose ruling will not be reversed unless it reflects an abuse of that discretion." *Redmond v. Socha*, 216 Ill. 2d 622, 651 (2005).

¶ 60    Jane Doe maintains that CPS "admitted" that it engaged in willful and wanton conduct and that a verdict in her favor was "evident." We disagree. As we explained, Jane Doe never introduced any evidence to establish that (1) CPS's act of permitting Bridgeforth to drive J.E. in his personal vehicle was generally associated with a risk of sexual assault or (2) CPS was

- 13 -

aware, by virtue of knowing that Bridgeforth was giving J.E. rides, that J.E. faced an impending danger of being sexually assaulted. To the contrary, essentially every CPS employee who testified at trial testified that Bridgeforth's behavior did not manifest any warning signs that could, or should, have led anyone at Ashburn to believe that he was a pedophile with whom J.E.'s safety should not have been entrusted.

¶ 61    Moreover, for all that was made of the fact that several CPS employees saw J.E. in Bridgeforth's vehicle in violation of the transportation policy, that evidence was effectively nullified by Jane Doe herself. At trial, Jane Doe testified that she had no reason to suspect Bridgeforth, and she even testified that, had she been asked, she actually would have given explicit permission to Bridgeforth to drive J.E. In light of that testimony, the jury could have concluded that the fact CPS violated its transportation policy was irrelevant, since it was known that Jane Doe would have ultimately given Bridgeforth permission if it had been requested. In essence, this testimony severed whatever causal link existed between the policy violation and J.E.'s injury. If Jane Doe would have given Bridgeforth permission to drive J.E. if he had asked, then the policy violations could not have caused J.E.'s injury. Either way, permission or no permission, J.E. would have ended up in Bridgeforth's car. We thus disagree with Jane Doe's assertion that a verdict in her favor was "evident."

¶ 62                        III. New Trial: Improper Closing Argument

¶ 63    We next consider Jane Doe's argument that she is entitled to a new trial because CPS's attorney misstated the law during closing argument. " 'A new trial is not warranted based on an improper opening statement or closing argument unless, when the trial is viewed in its entirety, the argument resulted in substantial prejudice to the losing party or rose to the level of preventing a fair trial. [Citations.] Errors in opening statements or closing argument *must* result in substantial prejudice *such that the result would have been different absent the complained-of remark* before reversal is required. [Citations.]' " (Emphases in original.) *Parsons v. Norfolk Southern Ry. Co.*, 2017 IL App (1st) 161384, ¶ 57 (quoting *Davis v. City of Chicago*, 2014 IL App (1st) 122427, ¶ 84).

¶ 64    Jane Doe contends that during CPS's closing argument, its attorney incorrectly argued to the jury that Jane Doe had to show that CPS acted intentionally. We need not consider the propriety of counsel's remark because, based on our review of the record, it cannot be credibly suggested that this statement impacted the outcome of the case. First, given the lack of evidence supporting the willful and wanton conduct claim, it is simply not possible that the jury would have returned a verdict in Jane Doe's favor had the challenged remark not been uttered. Moreover, even though Jane Doe's objection was overruled, CPS's attorney immediately corrected himself after Jane Doe objected and conveyed the correct definition of willful and wanton conduct to the jury. See *Lagoni v. Holiday Inn Midway*, 262 Ill. App. 3d 1020, 1035 (1994) (rejecting argument that a defense attorney's misstatement of a witness's testimony prejudiced the plaintiff because the misstatement "was immediately objected to and corrected by defense counsel"); *People v. Boyd*, 87 Ill. App. 3d 978, 985 (1980) (rejecting new trial claim due to prosecution's misstatement of the law where "the prosecutor immediately corrected himself in the next sentence"). Moreover, Jane Doe's attorney conveyed the correct standard to the jury during her closing argument, and during her rebuttal argument, her attorney expressly stated, "[w]e don't have to prove it's intentional," thereby curing any error. *Bruske v. Arnold*, 44 Ill. 2d 132, 138 (1969); see *Wilson v. Humana Hospital*, 399 Ill. App. 3d

751, 759 (2010). Any error was further cured by the circuit court, which, following closing arguments, instructed the jury that closing arguments are not evidence and tendered an instruction containing the correct definition of willful and wanton conduct. See *Lecroy v. Miller*, 272 Ill. App. 3d 925, 933 (1995). Under these circumstances, no reversible error occurred.

¶ 65                    IV. New Trial: Improper Jury Instructions and Verdict Forms

¶ 66        We next consider Jane Doe's argument that she is entitled to a new trial because the circuit court tendered instructions and verdict forms that were confusing and misstated the law. Specifically, she contends that the court erred by tendering IPI Civil No. 36.01 and verdict forms B and C. "Whenever an IPI instruction is applicable in a civil case, the trial court, giving due consideration to the facts and the prevailing law, is required to use that instruction." *Hobart v. Shin*, 185 Ill. 2d 283, 294 (1998); see Ill. S. Ct. R. 239(a) (eff. Apr. 8, 2013). "Generally, a trial court's decision to grant or deny an instruction is reviewed for abuse of discretion." *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 13. "The standard for determining an abuse of discretion is whether, taken as a whole, the instructions are sufficiently clear so as not to mislead and whether they fairly and correctly state the law." *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 505 (2002). However, when the issue is whether the instructions accurately stated the law, our review is *de novo*. *Studt*, 2011 IL 108182, ¶ 13. In either case, "[a] reviewing court ordinarily will not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant." *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 274 (2002).

¶ 67        We begin with IPI Civil No. 36.01. Jane Doe maintains that IPI Civil No. 36.01 was "unnecessary and confusing." However, her appellate brief fails to argue that IPI Civil No. 36.01 inaccurately stated the law or had the effect of rendering the instructions inaccurate as a whole. To compound matters, aside from some basic citations laying out our standard of review, Jane Doe did not cite a single case supporting her claim until her reply brief, at which point she directs our attention to *Misch v. Meadows Mennonite Home*, 114 Ill. App. 3d 792 (1983), and *Mileur v. Briggerman*, 110 Ill. App. 3d 721 (1982). By proceeding in this manner, Jane Doe denied CPS its rightful opportunity to respond to her argument, and she denied this court the benefit of two carefully thought-out arguments. Nonetheless, we have considered *Misch* and *Mileur*, and find that neither case supports Jane Doe's argument.

¶ 68        With respect to *Misch*, Jane Doe's reply brief highlights a passage in the court's opinion describing IPI Civil No. 36.01 as " 'reiterative and rather meaningless,' " and directing that it " 'be used sparingly.' " (quoting *Misch*, 114 Ill. App. 3d at 799). Jane Doe fails to mention, however, that the court in *Misch rejected* the plaintiff's argument that the circuit court erred by tendering IPI Civil No. 36.01. Worse still, Jane Doe's reply brief contains only a partial quotation of the court's ultimate disposition of the IPI Civil No. 36.01 issue; in full, the court said, "[t]he instruction is still proper, although it is reiterative and rather meaningless, and so should be used sparingly." (Emphasis added.) *Misch*, 114 Ill. App. 3d at 799. And in any event, *Misch's* admonition against using IPI Civil No. 36.01 is meaningless in light of Illinois Supreme Court Rule 239(a), which mandates the use in civil cases of all pattern instructions that are on-point and accurate statements of the law. Ill. S. Ct. R. 239(a) (eff. Apr. 8, 2013).

¶ 69        Jane Doe's reliance on *Mileur* is similarly misplaced. In *Mileur*, the plaintiff sued the defendant for personal injuries sustained during a hunting accident. The jury returned a verdict

for the plaintiff for $2700.89 and determined that the plaintiff was 50% at fault for his injuries. On appeal, the plaintiff argued that the circuit court erroneously tendered IPI Civil No. 36.01 because there was no evidence to justify it. This court agreed, stating, "based on the evidence the jury could not decide the issue of liability in defendant's favor, and the trial court, therefore, erred in giving this instruction." *Mileur*, 110 Ill. App. 3d at 728.

¶ 70     Attempting to draw a parallel between *Mileur* and the present case, Jane Doe emphasizes that "the jury could not have found in Defendant Bridgeforth's favor or against him on liability. The issue was already determined." But that misses the point. CPS propounded IPI Civil No. 36.01 to protect *its* interests, not Bridgeforth's. Regardless of whether Bridgeforth's liability had been established, CPS's liability was still undetermined.

¶ 71     Elsewhere, Jane Doe in her appellate brief appears to suggest that IPI Civil No. 36.01 somehow led the jury astray when it came time to apportion damages against Bridgeforth. That seems implausible, given that IPI Civil No. 36.01 does not mention Bridgeforth. And if IPI Civil No. 36.01 did confuse the jury, that confusion could have lasted only so long as it took the jury to finish reading IPI Civil No. 41.03, which stated:

> "The rights of the defendants Board of Education of the City of Chicago and Idris Bridgeforth are separate and distinct. Each is entitled to a fair consideration of his own defense and you will decide each defendant's case separately as if it were a separate lawsuit. Each defendant's case must be governed by the instructions applicable to that case."

¶ 72     We next turn our attention to Jane Doe's complaint regarding the court's decision to tender, over her objection, verdict forms B and C. Jane Doe maintains that "everything the jury could have lawfully decided, and even not lawfully decided as the jurors ended up doing, was accounted for on Verdict Form A. Because all of the Jury's findings could have been accounted for on a single verdict form, the use of multiple verdict forms was confusing, prejudicial, and ultimately led to a legally deficient verdict."

¶ 73     We disagree with this argument insofar as it pertains to verdict form B. Though it was perhaps duplicative of verdict form A in some respects, Jane Doe has nonetheless not explained why verdict form B was confusing. Nor has she attempted to explain how verdict form B rendered the instructions confusing and inaccurate in their totality. Jane Doe suggests that the jury's confusion was evidenced by the fact that one juror had difficulty answering the court's question when the jury was polled. Yet if anything, the record suggests that, rather than expressing reservations about the verdict, the juror was simply confused by the court's question. This seems apparent to us given that, once the court clarified what each component of the polling question meant, the juror answered, "yes." We find no error in the court's decision to tender verdict form B to the jury.

¶ 74     Verdict form C is a different matter. Jane Doe maintains that verdict form C was improper because "[t]he jury in reality could not find for Defendant Bridgeforth; it was a legal impossibility." This argument is well taken. Damages—in the sense of a manifested physical injury—are not an element of the tort of battery. See *Cohen v. Smith*, 269 Ill. App. 3d 1087, 1091 (1995). Thus, once the court told the jury that Bridgeforth had been found "liable," there was no way the jury could have legally awarded zero damages against him. Because verdict form C permitted the jury to do something the law did not allow and the jury did that very thing, we find that the court's decision to tender verdict form C prejudiced Jane Doe in her claim against Bridgeforth. As a result, we find that Jane Doe is entitled to a new trial against

- 16 -

Bridgeforth on all three categories of damages she requested.

¶ 75                                    V. New Trial: Damages

¶ 76    Jane Doe also argues that she is entitled to a new trial because the jury ignored proven elements of damages. Technically, our finding that Jane Doe is entitled to a new trial because the circuit court improperly tendered verdict form C to the jury renders this issue moot. Upon retrial, Jane Doe will have the opportunity to once again present evidence to substantiate her claimed damages. That fact notwithstanding, due to the possibility that the same problem will arise upon retrial, we believe that interests of justice and judicial economy warrant discussion of one aspect of this issue: Jane Doe's claim for damages for pain and suffering.

¶ 77    It is well established that "[t]he determination of damages is a question of fact that is within the discretion of the jury." *Snover v. McGraw*, 172 Ill. 2d 438, 447 (1996). It is equally clear from the case law that this court will not disturb a jury's decision to award (or not award) damages "unless a proven element of damages was ignored, the verdict resulted from passion or prejudice, or the award bears no reasonable relationship to the loss suffered." *Gill v. Foster*, 157 Ill. 2d 304, 315 (1993).

¶ 78    With respect to damages for pain and suffering, the supreme court has explained:

> "In cases in which a plaintiff's evidence of injury is primarily subjective in nature and not accompanied by objective symptoms, the jury may choose to disbelieve the plaintiff's testimony as to pain. In such a circumstance, the jury may reasonably find the plaintiff's evidence of pain and suffering to be unconvincing." *Snover*, 172 Ill. 2d at 449.

¶ 79    At first blush, that seems to describe this case in a nutshell: J.E. testified to her subjective feeling that Bridgeforth caused her to experience pain (she said it hurt when he put his finger in her vagina), but she had no objective evidence, like a hospital bill or doctor's note memorializing a course of treatment, to substantiate that claim. So it would appear that, under *Snover*, the jury was free to accept or, as it did in this case, reject J.E.'s testimony.

¶ 80    Yet we do not think the matter is so simple. First, the plaintiff in *Snover* did not bring a claim for sexual battery. Rather, *Snover* was a personal injury lawsuit following an automobile accident. More to the point, in *Snover*, the court pinned its analysis on the possibility that "the jury *** simply concluded [the plaintiff] *suffered only minor injury* and awarded damages accordingly." (Emphasis added.) *Id.* at 448.

¶ 81    In line with that holding, at oral argument, CPS's attorney urged this court to deem the injury J.E. suffered when Bridgeforth violated her legally "*de minimis.*" That invitation is easily rejected. In truth, the fact that the *Snover* plaintiff's injury was capable of being described as "only minor" sets this case and *Snover* worlds apart. At least insofar as pain and suffering is concerned, the harm visited upon a person by virtue of being sexually assaulted can *never* be characterized as *de minimis*. There is no doubt that the minor victim in this case was harmed by the sexual abuse visited upon her by Bridgeforth.

¶ 82    *Snover* itself does not require a different result. As we mentioned, *Snover* involved a more benign set of facts—a car accident—rather than a sexual assault. The harm that results from a sexual assault is categorically distinct from other more common forms of personal injury. A car accident may cause physical injury, but a sexual assault is an affront to the victim's personal dignity and autonomy; the injury is deep-felt and intrinsic.

¶ 83     The practical reality that would result from holding sexual assault victims to the *Snover* standard provides further counsel against applying *Snover* to cases like the one before us. *Snover* contemplates a world in which the plaintiff's injury is susceptible to objective verification. This normally occurs through testimony from a medical professional about the nature and extent of the plaintiff's injuries and course of treatment. That is fine and well for car crashes, slip-and-falls, and workplace mishaps, but sexual assault is different. Applying *Snover* to sexual assault cases would ignore the fact that not all sexual battery cases will present the sort of objectively verifiable physical injury contemplated by *Snover*. Some victims do not report until long after they were assaulted. Some victims will simply not bear the sort of physical indicia of injury *Snover* demands. Indeed, under *Snover*, only victims who suffered brutal attacks causing a manifestation of serious, latent, and objectively verifiable physical injuries would be able to recover damages for pain and suffering. That cannot be the correct result, and we seriously doubt that the supreme court intended that outcome in cases such as this when it decided *Snover*. We therefore decline to apply *Snover* here.

¶ 84     Instead, we hold that, in tort cases in which the plaintiff proves that he or she was sexually assaulted by the defendant, testimony by the plaintiff that the act constituting sexual assault caused the plaintiff to experience physical pain is, absent evidence to the contrary, sufficient evidence to necessitate an award of damages for pain and suffering.

¶ 85     With this guidance in hand, we remand this case to the circuit court for a new trial, solely against Bridgeforth, on the issue of damages.

¶ 86                              CONCLUSION

¶ 87     The circuit court's order denying Jane Doe's motion for judgment *n.o.v.* on her willful and wanton conduct claim against CPS is affirmed. The circuit court's order denying Jane Doe's motion for new trial is reversed with respect to her damages claim against Bridgeforth and is affirmed in all other respects. The case is remanded to the circuit court for a new trial, solely against Bridgeforth, on the issue of damages.

¶ 88     Affirmed in part; reversed in part; remanded with instructions.