FIFTH DIVISION
March 19, 2010

No. 1-07-3454

| | | |
|---|---|---|
| HEIDE WILSON, Individually and as Parent and Next Friend of Jeremy Wilson, | ) ) ) | Appeal from the Circuit Court Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | 00 L 9482 |
| HUMANA HOSPITAL, | ) ) | |
| Defendant-Appellee, | ) ) ) ) ) ) | Honorable Arthur L. Janura, Jr. and Cheryl A. Starks (posttrial motion only), Judges Presiding. |

JUSTICE LAVIN delivered the opinion of the court:

This appeal is the product of the trial of a medical negligence case brought by plaintiff

Heide Wilson on behalf of her son, Jeremy, who sustained physical and neurological injuries

around the time of his birth that plaintiff alleges occurred as a result of the negligence of the

hospital where he was born. In sum and substance, plaintiff claims that defendant Humana

Hospital, by and through its employees, was negligent for failing to timely perform and report

certain laboratory studies that allegedly would have altered the treatment of the pregnant mother

and the soon-to-be-born child in a manner that could have changed the child's unfortunate

medical outcome. Plaintiff's original complaint included the two treating obstetricians as

defendants, but plaintiff settled with one and voluntarily dismissed the other prior to the

beginning of the trial. The lengthy and vigorously contested trial was a classic battle of medical

experts, ending with a defense verdict and an answer to a special interrogatory that favored

defendant on the issue of the neurological condition of the child as it related to the applicable

statute of limitations, which was raised as an affirmative defense. Plaintiff now appeals, claiming a host of errors in the trial court on the admission of evidence, violation of motions *in limine*, as well as improper conduct by defense counsel in opening statement and closing argument. For the reasons discussed at some considerable length below, we affirm the judgment of the trial court.

BACKGROUND

On March 13, 1990, Heide Wilson (Heide) was several weeks short of her full term of pregnancy when her bag of waters ruptured, prompting her to appear at Humana Hospital (Humana) in the northwest suburban area of Chicago. There, she was treated by obstetricians Dr. Duboe and Dr. Ptasinski, various nurses and other hospital personnel. Most pertinent to the allegations of medical negligence in this matter, Dr. Duboe performed a vaginal swab and ordered a "stat" (as soon as possible) Group B streptococcus (GBS) culture to help rule out infection in light of Heide's presenting condition, the ruptured amniotic sac. Despite the fact that this test was surely ordered, extensive examination of the medical chart, along with related depositions of Humana's medical record custodians, established conclusively that there were no preliminary or final reports from this culture in the final medical chart that was produced to the parties during this litigation. No satisfactory explanation was ever forthcoming.

In the early portion of Heide's admission at Humana, the medical staff followed up on the tests that had been ordered, but there was no evidence that anybody followed up on the seemingly critical vaginal swab. In the absence of any medical evidence that there was an infection, the medical doctors administered tocolytic drugs in an effort to delay delivery for the benefit of the

preterm fetus, particularly in relation to fetal lung development. Despite this attempt to forestall delivery, Jeremy was delivered vaginally in the early morning hours of March 15, 1990. Jeremy was a number of weeks premature and upon birth was limp and motionless, and was observed to have significant difficulty breathing. He was immediately resuscitated and transferred to Humana's newborn special care nursery, where he was mechanically ventilated. The doctors were concerned that Jeremy was suffering from sepsis, so antibiotic treatment was begun. The medical staff then made the judgment that Jeremy needed a higher level of care than they could provide at their community hospital, so arrangements were made to transfer Jeremy to the better-equipped and more expertly staffed Rush Medical Center (Rush) in Chicago.

While at Rush, Jeremy continued to undergo diagnostic tests and also received treatment for the presumed sepsis. Among many tests that were done, doctors there ordered a urine countercurrent immunoelectrophoresis (CIE) test, which could potentially shed light on the nature of the infection. There was also information in the Rush medical chart that established that they were in contact with Humana and had learned the results of various tests performed at Humana, including the vaginal swab test for GBS. The Rush medical chart noted that a report from Humana revealed the vaginal swab culture was negative for GBS. For reasons that will be discussed below, the jury never heard about this important entry in the Rush chart.

In the wake of his premature delivery, Jeremy was hospitalized for many months before being transferred home, where he received ventilator support of varying degrees for nine long years. In 1999, Jeremy underwent a double lung transplant and continued to require medical treatment thereafter for his various maladies.

The Trial

Plaintiff's essential medical theory in this case posited that the failure to timely inform the medical staff of the results of the vaginal swab for GBS at Humana inexorably led to a management plan that did not include the administration of prophylactic antibiotics. This allegedly contributed to the fact that Jeremy was born the following day with sepsis, a blood-borne infection, that plaintiff alleges caused a medical cascade of unfortunate circumstances leading to years of mechanical ventilation, enormous medical expenses, a double lung transplant and brain damage in the form of periventricular leukomalacia (PVL), which caused various mental and developmental difficulties for Jeremy.

Defendant Humana understandably took a different view of the medical evidence. It presented evidence to the effect that Heide likely suffered from chorioamnionitis, a maternal infection of the amniotic sac, which is known to occur with premature rupture of membranes. This condition, according to defendant's several medical experts, was a competent cause of the sepsis suffered by Jeremy, who would have acquired it from his mother. In addition to introducing plentiful expert testimony on the issue of compliance with the standard of care, defendant vigorously defended this case on the issue of proximate cause, mostly focusing on the inherent potential complications associated with preterm birth, including the fact that Jeremy's lungs were demonstrably immature, necessitating intubation, mechanical ventilation and other treatment to help his lungs function in a lifesaving manner. Defendant also supplied evidence from Rush to the effect that a Rush laboratory study (the CIE test) essentially negated any realistic possibility that Jeremy's sepsis was caused by GBS. Finally, in a case that was filed

more than 10 years after Jeremy's birth, defendants filed an affirmative defense alleging that the relevant 8 year statute of limitations had expired, while plaintiffs urged that it should be tolled because of the minor child's alleged neurological disability.

The parties engaged in extensive discovery and lengthy motion practice prior to trial. For the purposes of this appeal, the most significant pretrial motion concerned plaintiff's request for sanctions related to the failure to produce a preliminary and/or final report from the vaginal swab test. Defendant conceded that the lab reports were indeed missing from the medical chart. Rather than wait for the jury instruction conference when a missing record instruction might be tendered (Illinois Pattern Jury Instructions, Civil, No. 5.01 (2005)), plaintiff sought a much more significant sanction from the trial court. A detailed hearing on plaintiff's motion ended with the court ruling that the defendant would be barred from mentioning the note in the Rush medical chart that essentially stated that the vaginal swab had not only been performed, but that the results established that the culture was essentially normal and negative for GBS, a piece of information that would appear to any informed observer to stand in absolute contradiction to plaintiff's medical theory. The legal, medical and practical effects of this remarkable sanction order permeated the entire trial.

It also seemed, from the very beginning of the case, that the two experienced and very capable trial lawyers were occasionally at odds with each other. This began with defense counsel animating his opening statement with numerous references to opposing counsel by name, usually in relation to what he expected his colleague to attempt to do during the production of evidence at trial. Significant to the issues on appeal, defense counsel in his opening remarks stated that the

jury would hear evidence of the results of the CIE test done at Rush that allegedly indicated (with 96% probability) that Heide did not have GBS. This incisive statement was uttered without objection, but during a break in the proceedings before the first witness testified, plaintiff urged the court to strike the statement and instruct the jury to disregard it, arguing that the statement was a surprise and in violation of Rule 213 (210 Ill. 2d R. 213). Defense counsel told the court that the subject was not only in the Rush medical chart (which meant that it had been "known" for at least 16 years), but that it had recently utilized during cross-examination of a treating physician, Dr. Vasan, during her evidence deposition that was taken several days before trial. The court essentially stated that it was not going to strike the comment and the trial began.

Despite the vigorous objection to the comment made in opening statement, plaintiff's counsel, in what can only be termed a tactical decision, broached the subject of the CIE test on direct examination of his second witness, a nursing expert. This occurred only hours after opening statement. Defendant's objection pursuant to Rule 213 was overruled and the nursing expert testified generally on the subject. This same procedure was followed with three other experts, Dr. Thomson, Dr. Null, and Dr. Feldman, each called by the plaintiff. In different ways and to different lengths, each sought to discredit the authoritativeness and accuracy of the CIE test and at least one testified that the test had fallen out of favor in the medical community.

Going further, plaintiff also elicited testimony from Dr. Thomson to the effect that Humana's laboratory was negligent for failing to *perform* the vaginal swab that had been ordered at the beginning of Heide's admission. Defendant's objection that plaintiff had "opened the door" to testimony about the note on the Rush medical chart proving that the test had not only been

performed but was, in fact, negative was denied by the trial court, which at all times resolutely held to its sanction order, despite the fact that rigid adherence would seem to have excluded evidence that would have essentially disproved plaintiff's central medical theory. Also, it should be noted that during the cross-examination of Dr. Thomson and others, defense counsel utilized a medical article in an effort to undermine the medical theories involved in plaintiff's case. Plaintiff (who had also referred to the article earlier and referred to his colleague's earlier use of the article) interposed a foundation objection and defense counsel assured the court that he would "tie it up" with a later witness.

Plaintiff's evidence established a *prima facie* case of medical negligence, which pivoted purposefully around the missing GBS laboratory report. Plaintiff offered numerous opinions on violations of the standard of care and ample testimony that those several violations were, in natural or probable sequence, a cause of the physical and neurological injuries suffered by Jeremy. Plaintiff also presented the testimony of several witnesses as to the nature, extent and duration of those injuries. In addition, Jeremy testified (with no claim of incompetence being asserted) before the jury.

Sure enough, defendant presented a contrary case. It supplied testimony to the effect that the test in question would not factually have "grown or shown" anything by the time that Jeremy was transferred to Rush. It offered testimony by one treating obstetrician to the effect that he would not have administered prophylactic antibiotics even if the vaginal swab showed GBS. It was explained that the organism is so common that a positive GBS result would only indicate that the mother was a carrier and not that the fetus was at a conclusively demonstrable risk for an

infection.  Defendant put several medical experts (a neonatologist, a pathologist, a nurse, a neurologist, a neuropsychologist, and a pediatrician) on the stand who rebutted the essential testimony of plaintiff's experts on the standard of care and causation issues and also produced testimony to the effect that Jeremy's brain damage was attributable to prematurity and not malpractice.  The defense also presented evidence that tended to diminish the extent of the claimed neurological injuries.

After a lengthy jury instruction conference and spirited closing arguments, the jury deliberated and returned a verdict in defendant's favor and also answered a special interrogatory in defendant's favor on the statute of limitations issue.  Months after the verdict was rendered, the trial judge retired and the posttrial motions were denied by another judge from the circuit court.  This appeal followed.

ANALYSIS

Plaintiff first contends that defendant failed to timely disclose the testimony and/or opinions relating to CIE tests in violation of Supreme Court Rule 213.  210 Ill. 2d R. 213.  Plaintiff argues that defendant violated Rule 213 when it elicited testimony from witnesses relating to the CIE tests which established with 96% certainty that Jeremy did not have a GBS infection.  We disagree.

As an initial matter, it appears that plaintiff forfeited this issue by failing to timely object to the statements.  Forfeiture, however, is a limitation on the parties and not the reviewing court and this court may overlook forfeiture where necessary to obtain a just result or maintain a sound body of precedent.  In re Marriage of Holthaus, 387 Ill. App. 3d 367, 377 (2008).  Even though

this case had been litigated for many years, it is apparent from the record that the CIE test first was discussed by a witness less than a week before trial, during the evidence deposition of a Rush treating physician, Dr. Vasan. On cross-examination by defendant's counsel, Dr. Vasan testified that she had conducted a CIE test on Jeremy back in 1990 which did not indicate a GBS infection. This was proper, if only because Rule 213(g) provides that "[w]ithout making disclosure under this rule, however, a cross-examining party can elicit information, including opinions, from the witness." 210 Ill. 2d R. 213(g). We also note that the CIE results were contained in Rush records that plaintiff had complete access to during all of the discovery proceedings.

Perhaps in an effort to "front" the issue of these test results, plaintiff's counsel made a tactical decision at trial to directly question four of her first six witnesses regarding the CIE test and its reliability. Notably, those witnesses had not disclosed any prior opinions relating to the subject. Dr. Thomson, Nurse DiCostanzo, Dr. Null, and Dr. Feldman all testified to the effect that the CIE was not 100% conclusive and suggested that it was of dubious reliability. Given these circumstances, we cannot accept plaintiff's argument that defendant improperly raised the CIE test issue at trial.

By eliciting testimony from its own expert witnesses regarding the CIE tests, plaintiff opened the door to any defense cross-examination or rebuttal testimony relating to the issue. See Boland v. Kawasaki Motors Manufacturing Corp., USA, 309 Ill. App. 3d 645, 651 (2000). The trial court recognized this principle in denying plaintiff's posttrial motion on the issue, stating that plaintiff's assertion that she was "ambushed" by the testimony was unfounded, while

explaining that plaintiff's expert witnesses were examined on the same issue and Dr. Vasan's pretrial evidence deposition had previously revealed the information. We would be remiss if we failed to repeat the undeniable fact that this information was in the Rush chart for more than 16 years at the time of trial.

Plaintiff also argues that defendant failed to establish a foundation for an article that was used to cross-examine Dr. Thompson, Dr. Feldman, and Dr. Null. The article, titled "Countercurrent Immunoelectrophoresis in the Evaluation of Infants with Group B Streptococcal Disease," appeared in the Journal of American Pediatrics and relates to the use and reliability of CIE tests. Carol J. Baker et al., Countercurrent Immunoelectrophoresis in the Evaluation of Infants with Group B Streptococcal Disease, *The Journal of Pediatrics*, June 1980, at 1110. Cross-examination of an expert witness with material from a recognized text is proper if the court has taken judicial notice of the author's competence or if the cross-examiner proves the text is authoritative. Bowman v. University of Chicago Hospitals, 366 Ill. App. 3d 577, 587 (2006), citing People v. Johnson, 206 Ill. App. 3d 875, 879 (1990).

During cross-examination, both Dr. Feldman and Dr. Null acknowledged that they subscribed to the journal in question. Dr. Feldman further acknowledged that the article was peer reviewed and that it could be reasonably relied upon in a research context. Dr. Feldman would not agree that the information within the article was "reasonably reliable," presumably referring to its use in a practice context. Although Dr. Feldman appeared to acknowledge the author's competence and endorsed the use of the article in a research context, a foundation was arguably still not properly laid. We will not, however, reverse on the basis of an erroneous evidentiary

10

ruling unless the error was prejudicial or the result of the trial was materially affected. Stricklin v. Chapman, 197 Ill. App. 3d 385, 388 (1990). Any error here, assuming one had even occurred, was harmless in light of plaintiff's experts' responses to the article during cross-examination, the relatively narrow subject matter of the article addressing the reliability of CIE tests, and other evidence ultimately presented at trial by defendant.

Plaintiff also argues that defendant's closing argument improperly addressed CIE tests by overstating their reliability a number of times. During closing arguments, defense counsel stated that CIE tests were "96% accurate" and "96% plus accurate." We first note that we have already found that the testimony relating to CIE tests was properly elicited. Most importantly however, testimony by expert witnesses established that CIE tests are indeed 96% reliable. Defense counsel's comments were clearly based upon the evidence presented at trial. Further, the trial court specifically instructed the jury that if "any statement or argument of an attorney is not supported by the law or the evidence you should disregard the statement." The plaintiff also exercised the option to discuss defendant's CIE test in rebuttal. Any possible error here in closing arguments was cured by these circumstances. See Bruske v. Arnold, 44 Ill. 2d 132, 138 (1969) (court stated that to the extent defense counsel, in closing arguments, exceeded boundaries of permissible advocacy in presenting plaintiff's testimony, it was cured by the trial court's remarks that the jury should rely only on the evidence and plaintiff's opportunity during closing argument to rebut any misstatements); Brooke Inns, Inc. v. S & R Hi-Fi & TV, 249 Ill. App. 3d 1064, 1089 (1993) (court found that references made during closing arguments lacked sufficient supporting evidence but that error was harmless, noting that court instructed jury that a

counsel's arguments were not evidence). Accordingly, we find that the trial court did not abuse its discretion by permitting the testimony regarding CIE tests and, therefore, that defendants did not violate Rule 213.

Plaintiff next contends that defense counsel's comments during opening statement and closing argument were improper because they allegedly impugned the integrity of plaintiff's counsel. We disagree.

Plaintiff first argues that during opening statement, defense counsel twice stated to the effect that "[Jeremy] didn't have GBS," apparently implying that plaintiff had lied to the jury during his opening statement. We first note that contrary to plaintiff's assertion, the record indicates that no contemporaneous objection was made to the statements. Such a failure results in a forfeiture of the issue for review. Nassar v. County of Cook, 333 Ill. App. 3d 289, 304 (2002). Forfeiture aside, we find that the impropriety of such comments was minimal at best and primarily served to explain what defendant believed the evidence would show. In fact, a subsequent comment to that effect was given to the jury by the trial court. Plaintiff also argues that defense counsel improperly remarked that "[plaintiff's counsel] mentioned that we're missing a preliminary report from the 14th. We're not missing a report from the 14th." We note that when plaintiff objected, it was argued that there was no evidence to support the statement, not that the comment disparaged plaintiff's counsel and impugned his integrity, as is now argued on appeal. More importantly, however, it is apparent that this comment was only an explanation as to what the evidence at trial would ultimately show and did not serve to disparage plaintiff's counsel.

Plaintiff next argues that defense counsel's references to plaintiff's counsel by name throughout the trial were improper, for they suggested that the case concerned the integrity of plaintiff's counsel. However, plaintiff's counsel himself explained to the jury that although both plaintiff and defendant's counsel referred to each other by name, the "case has not been tried around the lawyers." The trial court also observed, when ruling on this issue in plaintiff's posttrial motion, that juries are "sophisticated enough to know that the true parties to any lawsuits are the clients and not the lawyers." This is an observation with which we agree and we do not find any reason why the jury in this case would be any different. Furthermore, a careful review of the record does not reveal any significant evidence implying that defense counsel was somehow attempting to bring plaintiff's counsel's integrity into question by referring to him by name.

Plaintiff also raised numerous issues with defense counsel's closing argument, citing a litany of various remarks made by defense counsel. It is important to note that many of the remarks plaintiff now finds objectionable were not objected to at trial and therefore have been forfeited. See Nassar, 333 Ill. App. 3d at 304. Plaintiff's remaining arguments relating to the remarks made during closing arguments are unavailing. As a general matter, we must first acknowledge that counsel is afforded wide latitude in closing argument. Cretton v. Protestant Memorial Medical Center, Inc., 371 Ill. App. 3d 841, 863 (2007). Plaintiff argues that defense counsel's remark stating that "[t]here are no witnesses that I had available to call who could come in and explain what happened with these pathology reports. No one remembers this case, even the witnesses ***" was improper. Plaintiff, however, raised an objection to the statement which

13

was sustained. Furthermore, as mentioned earlier, the trial court instructed to jury to disregard statements unsupported by the evidence or law. Generally speaking, sustaining an objection and giving an instruction to the jury cures any prejudicial impact of an error. Clayton v. County of Cook, 346 Ill. App. 3d 367, 383 (2003). Therefore, the prejudicial impact of defendant's statement, which was minimal at best to begin with, was further mitigated by the sustained objection and subsequent instruction.

Finally, plaintiff, in a single sentence, also claims that defense counsel improperly referenced the CIE test as "very accurate." Plaintiff has again failed to recall that defendant's expert witnesses testified to the effect that the CIE test was 96% reliable. Accordingly, defense counsel's comments during opening statement and closing argument were not improper and any error that may have occurred simply does not rise to the level of reversible error.

Plaintiff next argues that the trial court erred in failing to enforce its sanction order. This is a breathtaking contention, given the inarguable fact that the sanction order was incredibly draconian in the way it hamstrung defendant and how it allowed plaintiff to skirt the damning effect of the information from the Rush chart. Simply stated, the court's order was not only drawn in plaintiff's favor and enforced many times in plaintiff's favor, it is safe to say that but for the defense verdict, it could have operated to allow plaintiff to prevail on a theory that would appear to be factually, legally and medically untenable.

The constraints of the order colored the entire trial, with plaintiff earnestly endeavoring to present a case whose central theory held that the never-found results would have likely revealed a GBS infection which would have compelled the treating physicians to administer

14

prophylactic antibiotics and hasten delivery, thus avoiding the sepsis and its sequellae. This, of course, was done with plaintiff comfortable at all times in the knowledge that the jury would never hear the contrary evidence from the Rush medical chart. The court's sanction order allowed a case to proceed on what was essentially a falsehood, a circumstance which we find to be problematic despite the hospital's deplorable conduct of losing or perhaps discarding portions of the medical record.

Nonetheless, plaintiff attempts to extract one final benefit from the sanction order on appeal, by arguing that allowing defense counsel to cross-examine Dr. Feldman on the change in his opinion was a sly attempt expose the jury to evidence barred by the order. We disagree. Simply put, the record established that the witness did change his opinion after different records were given to him subsequent to his initial opinions. A review of the record does not indicate that the defendant cross-examined plaintiff's witness in an attempt to reveal the information barred by the trial court's sanction order. Prior to the cross-examination, the trial court stated:

> "I see nothing wrong with the defendant being able to question whether an opinion is
> changed from before until now. It appears that the plaintiffs have properly instructed
> their witness to comment on it based on the fact that certain information they had when
> they made their initial opinion is no longer available or is found to be unreliable."

The trial court also commented that once the change in opinion was established, the parties should move on and not dwell on the issue. This court has held that the trial court "is in the best position to interpret its own orders and as such a court's interpretation of its own order should not reversed unless record clearly shows an abuse of discretion." Board of Trustees of Community

College District No. 508 v. Rosewell, 262 Ill. App. 3d 938, 965 (1992). We find no abuse of discretion here and we therefore decline to find that the trial court violated its own order.

Defendant next contends that the trial court erred in allowing defendant to introduce evidence regarding regulations in Table A of the Illinois Administrative Code (77 Ill. Adm. Code §250. Table A).

Table A provides that bacterial culture results should be made available within 24 hours of collection of the tested culture. Testimony elicited at trial suggested that the standard of care did not require culture results within 24 hours and that nurses would typically not be required to obtain results until 48 hours had passed. In light of ample testimony indicating that normally no culture result for GBS would be available within 24 hours of collection, we find that this testimony was properly elicited so as to avoid absurdity in the interpretation of Table A. Without such testimony, it would appear that satisfying the standard of care would require a culture result within 24 hours when said culture simply could not normally produce a result within 24 hours. We note that plaintiff was free to argue a contrary interpretation should they have disagreed. We find no error here.

Finally, defendant's remaining contention relates to a jury instruction tied to defendant's statute of limitations affirmative defense. Defendant argues that the jury was improperly instructed as to the special interrogatory relating to defendant's statute of limitations defense.

At the time of the alleged incident, section 13-212(b) of the Code of Civil Procedure provided:

> "[N]o action for damages for injury or death against any physician, dentist,

registered nurse or hospital duly licensed under the laws of this State, whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought more than 8 years after the date on which occurred the act or omission or occurrence alleged in such action to have been the cause of such injury or death where the person entitled to bring the action was, at the time the cause of action accrued, under the age of 18 years."

Ill. Rev. Stat. 1989, ch. 110, par. 13-212(b).

However, section 13-212(c) tolled section 13-212(b)'s statute of limitations if the person entitled to bring an action was under a legal disability (other than being under the age of 18 years) at the time the cause of action accrued, then the period of limitations does not begin to run until the disability is removed. Ill. Rev. Stat. 1989, ch. 110, par. 13-212(c).

Humana's alleged negligence occurred on March 14, 1990, and plaintiff did not file the instant case until August 18, 2000. The record reveals that the parties and the trial judge had a lengthy discussion regarding this matter during the instructions conference. When the trial court subsequently instructed the jury on the aforementioned statutes, it stated:

"[T]here was a law in force in Chicago, Illinois at the time of the occurrence in question, a certain statute which provided that no action for damages from injury against any registered nurse or hospital duly licensed under the laws of the state of Illinois arising out of patient care shall be brought more than 8 years after the date on which occurred the act or omission or occurrence alleged in such action to *** have been the cause of such injury or [*sic*] the person entitled to bring the action was, at the time of the cause of action accrued, under the age of 18."

1-07-3454

The trial court also provided the instruction:

> "If the person entitled to bring an action described in this Section, which in this case is Jeremy, is at the time of the cause of action accrued under a legal disability other than being under the age of 18 then the period of limitations does not begin to run until the disability is removed. Also, this lawsuit was filed on August 18th, 2000."

Finally, the special interrogatory submitted to the jury asked:

> "Because of his developmental disability, was Jeremy incapable of managing his person or property and could not comprehend his rights or the nature of the act giving rise to this cause of action for at least 29 months after his birth?"

Plaintiff here argues that the trial court did not provide sufficient guidance in the interpretation of the relevant statutes.

As an initial matter, we note that the special interrogatory and the general verdict here are consistent. The jury responded to the special interrogatory in the negative (thus indicating that defendant had successfully proven its affirmative defense that the statute of limitations had run) and also signed the verdict form in defendant's favor. Where the answer to a special interrogatory is consistent with a general verdict, the answer to the special interrogatory is meaningless. Kosrow v. Acker, 208 Ill. App. 3d 143, 146-47 (1991); Zitlaw v. Woszenzynski, 102 Ill. App. 3d 804, 810 (1981). Normally, we would end our discussion here, but the trial court instructed the jury to sign the general verdict form in favor of defendant should it find for defendant on the merits or if it finds defendant had proved its affirmative defense. Therefore, it is unclear whether the jury found in favor of defendant based on its affirmative defense and the

18

merits, or based on its affirmative defense alone. Because of the possibility of the latter outcome, we are inclined to discuss the sufficiency of the trial court's jury instruction.

Plaintiff, on appeal, claims that the jury was not properly instructed on the issue. We find no basis to this argument. The jury was comprehensively instructed as to the statute of limitations and the conditions to toll the statute of limitations in the best possible fashion, given the relative complexities of this issue. Parenthetically, we should note that this particular issue was also made somewhat confusing because, as Jeremy's testimony revealed, whatever neurological condition may have existed did not cause him to be incompetent to testify at trial.

The definition of a legal disability contained within the special interrogatory and submitted to the jury was taken from Bloom v. Braun, 317 Ill. App. 3d 720, 730-31 (2000). In Bloom, this court dealt with precisely the same issue and explicitly approved the language used in the instant case in defining a legal disability. In fact, there were two approved definitions outline in Bloom and the trial court here chose the definition that plaintiff's counsel expressly preferred, based upon our detailed review of the record of the instruction conference. We acknowledge that the language of the special interrogatory was potentially confusing in that it could be interpreted as an inquiry of Jeremy's overall cognitive abilities as an infant, *i.e.*, in the "29 months after his birth," but the record indicates that the trial court offered further instruction to the jurors during their deliberations after receiving a question from them. This information clarified that the interrogatory only asked whether Jeremy's condition existed, and if it did, did it exist during the 29 months following his birth. The trial court included the Bloom-approved language at least twice more after giving the original instruction regarding the definition of a

19

legal disability.  Accordingly, we find that the trial court did not err here when instructing the jury on the definition of a legal disability.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

TOOMIN, P.J., and FITZGERALD SMITH, J., concur.

1-07-3454

| | |
|---|---|
| Please Use Following Form:<br><br>Complete TITLE of Case | HEIDE WILSON, Individually and as Parent and Next Friend of Jeremy Wilson,<br><br>Plaintiff-Appellant,<br><br>v.<br><br>HUMANA HOSPITAL,<br><br>Defendant-Appellee. |
| Docket No.<br><br>COURT<br><br>Opinion Filed | Nos. 1-07-3454<br>Appellate Court of Illinois<br>First District, FIFTH Division<br><br>March 19, 2010<br>(Give month, day and year) |
| JUSTICES | JUSTICE LAVIN delivered the opinion of the court:<br><br>Toomin, P.J., and Fitzgerald Smith, J.,      concur [s]<br><br>dissent[s] |
| APPEAL from the Circuit Ct. of Cook County. | Lower Court and Trial Judge(s) in form indicated in the margin:<br><br>The Honorable Arthur L. Janura, Jr. and Cheryl A. Starks (posttrial motion only), Judges Presiding. |
| For APPELLANTS, John Doe, of Chicago.<br><br>For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel)<br><br>Also add attorneys for third-party appellants or appellees. | Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented.<br><br>Attorneys for **Plaintiff-Appellant**: Heide Wilson    William J. Harte, Ltd.<br>111 W. Washington St., Suite 1100<br>Chicago, IL 60602-2705<br>Phone 312.726.5015<br><br>Hegarty & Heath<br>70 W. Madison St., Suite 2070<br>Chicago, IL 60602<br>312.263.7728<br><br>Attorneys for **Defendant-Appellee:** Humana Hospital    Michael Prangle, Hugh Griffin, Jacob Goldstein<br>Hall Prangle & Schoonveld, LLC.<br>200 S. Wacker Drive, Suite 3300<br>Chicago, IL 60606<br>Phone: 312.345.9600 |