2020 IL App (1st) 192026-U

SIXTH DIVISION
November 6, 2020

No. 1-19-2026

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| AMERICAN REMODAL & CONSTRUCTION, INC., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 M 54900 |
| | ) | |
| FELIX FERNANDEZ, | ) | Honorable |
| | ) | John Hynes, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Connors and Harris concurred in the judgment.

**O R D E R**

¶ 1    *Held*: Trial court's judgment in plaintiff's favor on breach of contract claim affirmed where the evidence at trial demonstrated the existence of a valid oral contract to remodel property, performance by plaintiff, breach by defendant, and resulting injury to plaintiff; trial court's award of damages was also supported by the evidence at trial.

¶ 2    Defendant Felix Fernandez appeals from a decision of the trial court awarding plaintiff American Remodal Corporation, Inc. (ARC), an Illinois corporation, $28,828.67, plus costs, on its breach of contract claim. In its ruling, the trial court found ARC substantially performed under a

valid oral contract and that Mr. Fernandez still owed ARC $39,728.67 in compensation for that work. The court reduced the award by $10,900 due to various deficiencies in performance. On appeal, Mr. Fernandez argues that the trial court's judgment was against the manifest weight of the evidence and ARC failed to make a *prima facie* showing of a valid contract. For the reasons that follow, we affirm.

¶ 3                                  I. BACKGROUND

¶ 4     On February 28, 2018, ARC filed the operative complaint in this action, alleging breach of contract. ARC also brought a claim for quantum meruit in the alternative, but that claim is not at issue on appeal. The complaint alleged that Mr. Fernandez had entered into an oral contract with ARC to remodel a two-flat apartment building located at 2326 South Wolcott Avenue in Chicago (Wolcott Property) for "the agreed upon sum." The complaint further alleged that Mr. Fernandez accepted the offer, that ARC fully performed the remodeling work, and that Mr. Fernandez still owed ARC $70,538.02 for labor and materials.

¶ 5     Mr. Fernandez filed his answer, affirmative defenses, and a counterclaim on April 18, 2018. Mr. Fernandez's affirmative defenses were that he fully performed under the "alleged agreement;" ARC failed to fully perform under the agreement; ARC failed to state a cause of action; ARC failed to mitigate its damages; and ARC's claims were barred (1) by the doctrine of unclean hands, (2) due to fraud and illegality, and (3) by its own breach. In his counterclaim, Mr. Fernandez alleged that ARC breached the parties' contract because it did not finish its remodeling obligations. Mr. Fernandez requested damages of $30,000 for the breach or, in the alternative, the amount ARC had been unjustly enriched.

¶ 6     A bench trial was held on August 21, 2019. Both Sergio Huerta, a general contractor and the owner of ARC, and Mr. Fernandez testified at trial. Both attested to an agreement between

them for a total rehabilitation of the two-flat apartment building at the Wolcott Property. According to Mr. Huerta, the parties agreed Mr. Fernandez would pay Mr. Huerta $35 an hour and Mr. Huerta's employees $25 an hour, Mr. Fernandez would pay for all materials purchased for the job, and ARC would receive a bonus upon the completion of the project equaling 10% of the total charges. Mr. Huerta testified that he obtained the permit from the city "as a favor" for Mr. Fernandez and that they negotiated the agreement thereafter. According to Mr. Huerta, Mr. Fernandez said his "right-hand man" Luis Ballesteros would be present at the worksite the entire time and would monitor the work done by each individual.

¶ 7     Mr. Huerta testified that after obtaining a building permit for the property on June 6, 2013, he began construction in the first or second week of January 2014. He kept his own records regarding the hours he and his employees worked, which were submitted as exhibits at trial. He testified that he would give these time sheets to Mr. Fernandez or one of Mr. Fernandez's employees periodically. He testified that no one ever said there was an issue with the hourly breakdown. Included in the time sheets were notes concerning cash payments made to Mr. Ballesteros's uncle who did tuckpointing work at the Wolcott Property. Mr. Huerta testified that he wrote those payments down "so that [he] kn[e]w that [he] gave it to [Mr. Fernandez]" and so he could "tell Mr. Fernandez *** [he] paid [Mr.] Ballesteros this week and [Mr. Ballesteros] paid his uncle."

¶ 8     In addition to the time sheets, Mr. Huerta testified that he provided Mr. Fernandez or one of Mr. Fernandez's employees receipts for materials purchased for the Wolcott Property every two or three weeks. Mr. Huerta testified that Mr. Fernandez would, at various times, reimburse him for materials or pay him in advance for materials purchased for the Wolcott Property. When Mr. Huerta hired a subcontractor, he would get an estimate of the cost from the subcontractor, notify

Mr. Fernandez, and then Mr. Fernandez would give him the money, "but not—not the whole thing. Only what is necessary. Like, let's say the roofer, right. If he says, 'I need $3,000' " then Mr. Huerta would tell Mr. Fernandez, "I need this much to continue the project, but I need $3,000 extra so I can, you know, give to the roofer. But usually, he give me 10,000, 15,000, 20,000, you know. I mean, you can see the checks." A record of checks Mr. Fernandez made out to ARC— usually for between $10,000 and $20,000, for work on the Wolcott Property starting in January 2013 and ending in October 2014—was included as a joint exhibit.

¶ 9     According to the permit inspection history, submitted as evidence by both parties, inspectors from the Department of Buildings gave final approval of the Wolcott Property in November 2014. Mr. Huerta testified that "the job was completed" after that approval. Mr. Huerta also testified that he reached out to Mr. Fernandez requesting payment in full for his work, but Mr. Fernandez "kept pushing it" and never paid the final amount due.

¶ 10    Mr. Fernandez testified as an adverse witness during ARC's case in chief. He stated that he was a joint owner of the Wolcott Property with his son, Antonio Fernandez. Mr. Fernandez testified that he contracted with Mr. Huerta to do work on the property after previously hiring him for a different remodeling project. He testified that discussions on the Wolcott Property began in March 2013 and led to an agreement in early 2014 that ARC would "do the remodeling and two permits." Mr. Fernandez testified that the parties agreed to a flat rate of $120,000. However, when confronted with his deposition testimony—where he specifically stated the $120,000 figure was an approximation and not a flat rate that the parties agreed to for the work—Mr. Fernandez testified, "[u]nder my credit, I was—thought that it was going to be no more than 120. And it was going to be—maybe I [was] mistaken that I did—that I didn't pay attention on that." He agreed, however, that the parties did not put any conditions on the fees and acknowledged that, as he was

getting older, he was starting to have memory problems.

¶ 11    Mr. Fernandez testified that he was living in Mexico for much of the remodeling and "left the payment" up to Mr. Ballesteros, who was also working on the Wolcott Property. Mr. Fernandez testified that he visited the property about four times during the remodeling and only saw Mr. Huerta once. Mr. Fernandez detailed the payment procedure: "I would not be receiving any invoice from [Mr. Huerta]. [Mr. Huerta] would just give these invoices to Mr. Ballesteros. And then Mr. Ballesteros would go through my stuff and ask for the check, and we will give it to him." Mr. Fernandez testified that he did not know anything further about the payment transactions because he "was not in the dealings of the paperwork." He testified that his accountant, his secretary, and Mr. Ballesteros all worked for him and were authorized to accept bills and make payments on his behalf.

¶ 12    ARC also called Juan Sanchez, Salvador Rodriguez, Joel Gamez, Carlos Ramos, and Antonio Resendiz as witnesses. These men had all done work on the property and testified that Mr. Huerta was there almost every day.

¶ 13    Mr. Gamez, a licensed plumber, testified that that he believed he completed the installation of the toilet properly and that the city code required 13 inches from the wall to the center of the toilet. Mr. Gamez explained, however, that "sometimes when there's like the joint or support or something at the bottom, you cannot cut the toilet. So sometimes the toilet can be a little bit more on the front." He testified that the toilet was stable when he installed it, but that after five years it could have become unstable. Mr. Gamez testified that the toilet passed inspection and that he was never made aware of an issue with his installation of it.

¶ 14    Mr. Ramos, who installed the flooring on the first and second floor of the Wolcott Property, testified that he checked to make sure the floor was level just by looking at it.

¶ 15    Mr. Resendiz was brought on to the project as a mechanical contractor by Mr. Fernandez's son, Rudolfo Fernandez. Mr. Resendiz testified that he installed a Decane-brand heating and cooling unit instead of a Carrier-brand unit because that "was the agreement that [he] had with Mr. Fernandez's son." He testified that Decane was "mid-grade equipment."

¶ 16    Both parties stipulated to the admissibility of all exhibits offered as evidence in the case. The exhibits demonstrated that the remodeling was divided into three separate stages and detailed the amounts owed for each stage of work, including the costs of materials, labor, and subcontractor fees. The three stages, together, totaled $214,908.67. The parties stipulated that Mr. Fernandez had paid ARC a total of $175,180.00. Additional exhibits contained the blueprints for the Wolcott Property, which called for Carrier as the brand of heating and cooling unit to be installed, pictures of the Wolcott Property, estimates for repairs, and the permit history from the Department of Buildings.

¶ 17    Following the close of ARC's case-in-chief, Mr. Fernandez moved for a directed finding. The trial court granted the motion as to ARC's quantum meruit claim, holding that because there was no dispute as to the existence of a contract, the elements for quantum meruit relief were not met. The trial court denied the motion as to the breach of contract claim. The trial court found that Mr. Fernandez forfeited his Statute of Frauds argument by failing to raise it as an affirmative defense, and that, regardless, application of the rule turns on whether the contract "could have been performed within a year" and "[i]n this case, it's clear that this contract—oral contract—could have been performed within a period of one year." The court noted: "Mr. Fernandez testified that the agreement was not to begin until 2014. The work was done in 2014, completed within the year of 2014." The trial court further found that ARC "established a *prima facie* case by presenting at least some evidence [on] each and every element assigned to the underlying cause of action

contained in the complaint."

¶ 18    Mr. Fernandez then testified for the defense as to a variety of issues with the renovations ARC performed. He testified that the floors sagged and were uneven, the deck stairs were too short, the handrails were unstable, the tuckpointing was poorly done, and the water gutters were not finished. He testified that he spent $16,000 to finish the remodel. Antonio Fernandez, Mr. Fernandez's son, who moved into the Wolcott Property after the remodeling was complete, also testified to issues with the remodel: installation of the rear deck blocked a door, the front door had a gap at the base, the floors were chipped and uneven, the toilets leaked and were unstable, a rear deck handrail was loose, the rear deck steps were too shallow, and there were issues with the masonry. He said that there were no issues with the heating and cooling system.

¶ 19    Jose Marin Lorena testified that in October 2018 he prepared an estimate for the cost of repair work to the Wolcott property, which he said was necessary to bring the building into compliance with the city code. He also testified that he could not give an opinion as to what the property might have been like in 2014.

¶ 20    Isaac Rojas testified that he placed a bid to do heating and cooling work at the Wolcott Property and that Mr. Huerta asked him to increase that bid by $3,000, which he declined to do. Mr. Rojas testified that he did not get the bid and a cheaper brand of equipment was installed than the one he would have used.

¶ 21    The court made its findings on September 6, 2019. First, it determined that both sides agreed an oral contract existed between ARC and Mr. Fernandez to remodel the Wolcott Property, and that they only disagreed as to the terms of that contract. Regarding the terms, the court found that Mr. Huerta's testimony as to hourly wages was supported by the exhibits in the case, particularly "the handwritten time sheets prepared by [Mr. Huerta] on a daily basis" and the

"invoices and receipts submitted." The court found that Mr. Fernandez's testimony concerning a $120,000 limit was impeached by his deposition testimony, in which he stated that was an estimate. The court noted Mr. Fernandez "was also impeached by the fact that he continued to pay the invoices even though as per his testimony, he had the ultimate decisions, and that the 120,000 mark after reviewing the exhibits was actually reached sometime around August of 2014 well before the job was completed." The court also considered Mr. Fernandez's admission that he had memory problems.

¶ 22    The court found "that the $120,000 was an estimate, not a total flat rate[,] *** the workers were paid on an hourly basis[, and] *** the materials, labor, [and] subcontractors were paid during the course of this project through these draws that were approved by [Mr. Fernandez], who was the ultimate decision maker." As the $120,000 was not a flat rate, the trial court found that Mr. Fernandez failed to meet his burden for his counterclaim. The court found that there was no corroborating evidence for the 10% bonus, so it did not include the bonus as a term of the contract.

¶ 23    The court also found that ARC substantially performed under the contract, noting that Mr. Huerta was personally on the job almost every day, as were his employees. The court stated:

> "Both sides agree that [the exhibits] accurately show the amount of—amount expended by [ARC] and the work done. Although [Mr. Fernandez] contests that the fact that all the work was done in a workman like manner, or that it was not up to the specifications according to the code, or the specifications according to the blueprint plans, the [c]ourt finds that [ARC] has substantially performed under the contract."

¶ 24    Using the exhibits stipulated to by both parties, the court calculated that ARC spent $214,908.67 on labor and materials and Mr. Fernandez paid $175,180.00. Accordingly, the court found that Mr. Fernandez still owed ARC $39,728.67.

¶ 25 Finally, the court addressed "whether [Mr. Fernandez] proved an affirmative defense that he would defeat [ARC]'s claim in total, or in the alternative reduce the amount of damages awarded." The court held Mr. Fernandez did not meet his burden for most of his affirmative defenses. However, on the affirmative defense that ARC was in breach for doing substandard work and work that did not comply with the city code or the blueprints, the court found some merit and reduced the amount that he would have otherwise awarded. In doing so, the trial court addressed Mr. Fernandez's major areas of concern with the quality of the workmanship.

¶ 26 The court first noted that while Mr. Fernandez alleged the upstairs toilet was improperly installed because the tank was too far from the wall, Mr. Gamez disputed this, and the city inspector had approved the toilet. The court found Mr. Fernandez did "not prove[ ] that [ARC] breached the contract with regards to the toilets." The court next considered the installation of the heating unit, where ARC installed a Ducane unit, which was inferior to the Carrier brand provided for in the blueprints. Because Mr. Resendiz testified that he installed the Ducane unit based on an agreement with Mr. Fernandez's son, the unit passed inspection, and Antonio Fernandez never complained about the heating or cooling in the apartment, the court determined that Mr. Fernandez failed to prove breach on that portion of the contract. The court also found that the tuckpointing on the Wolcott Property was completed by individuals hired by Mr. Fernandez and, therefore, any defect in the tuckpointing did not amount to a breach by ARC.

¶ 27 The court found, however, that ARC failed to install the floors in a workmanlike manner and reduced the damages award by $8,400 based on figures provided by Mr. Lorena. Finally, the court considered the back deck, which it determined was also installed in an unworkmanlike manner, and further reduced ARC's damages by $2,500, resulting in a final award of $28,828.67.

¶ 28 Mr. Fernandez now appeals.

¶ 29                                    II. JURISDICTION

¶ 30    The trial court entered its final judgment in this case on September 6, 2019, and Mr. Fernandez timely filed his notice of appeal on October 3, 2019. This court has jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered by the trial court in civil cases.

¶ 31                                    III. ANALYSIS

¶ 32    On appeal, Mr. Fernandez argues that the trial court's judgment in favor of ARC was against the manifest weight of the evidence, that ARC failed to mitigate its damages, that damages were not properly calculated, and that the trial court should have granted his motion for a directed finding. For the reasons that follow, we reject each of these arguments.

¶ 33    Mr. Fernandez's arguments rest, in part, on defenses or defense theories that he has forfeited by not presenting them to the trial court or including them in his answer. It is well settled that, if an appellant failed to raise a defense to a claim before the trial court, that defense is forfeited and cannot be raised for the first time on appeal. *Daniels v. Anderson*, 162 Ill. 2d 47, 58 (1994). In addition, a party generally forfeits affirmative defenses it does not plead. *Enterprise Recovery Systems, Inc. v. Salmeron*, 401 Ill. App. 3d 65, 76 (2010).

¶ 34    Mr. Fernandez's brief is riddled with claims he has forfeited. While he relies on the Illinois Frauds Act (Statute of Frauds) (740 ILCS 80/1 (West 2016)), he failed to allege this as an affirmative defense in the trial court. While he claims in this court that ARC violated the Home Repair and Remodeling Act (Remodeling Act) (815 ILCS 513/15 (West 2016)), he did not raise this statute in his pleadings or at trial. Finally, while he now argues there was no valid offer or acceptance, he never argued this at trial. Bearing this in mind, we address Mr. Fernandez's arguments for reversal to the extent that those arguments have not been forfeited. In addition,

because forfeiture is a limitation on the parties and not on the court (*Wilson v. Humana Hospital*, 399 Ill. App. 3d 751, 757 (2010)), we will also address the forfeited arguments where we find it appropriate to do so.

¶ 35        A. The Final Judgment Was Not Against the Manifest Weight of the Evidence

¶ 36     The trial court, after hearing and weighing the evidence before it, determined that Mr. Fernandez breached the oral contract he made with ARC by failing to pay ARC in full for the work it performed. "In order to establish a claim for breach of contract, a plaintiff must allege and prove the following elements: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." (Internal quotation marks omitted.) *Burkhart v. Wolf Motors of Naperville, Inc. ex rel. Toyota of Naperville*, 2016 IL App (2d) 151053, ¶ 14. Mr. Fernandez argues the trial court erred because, based on the weight of the evidence, (1) there was no valid contract, (2) ARC did not fully perform its obligations under the contract, (3) Mr. Fernandez did not breach the contract, and (4) ARC failed to mitigate its damages. For the following reasons, we disagree.

¶ 37                          1. There Was a Valid Contract

¶ 38     Mr. Fernandez argues that review of the trial court's judgment is *de novo*, as it is a "review from a trial court's interpretation of a contract as a matter of law." It is true that, generally, matters of contract interpretation are legal questions reviewed *de novo*. *In re Liquidation of Lumbermens Mutual Casualty Co.*, 2018 IL App (1st) 171613, ¶ 62. However, the issue before us is not one of contract interpretation. The trier of fact must "observe the conduct and determine the credibility of the witnesses when making findings of fact about the existence and terms of an oral contract." *Mormat Electrical & Construction Services, LLC v. Hunter Construction Services, Inc.*, 2019 IL App (5th) 170316, ¶ 8. In cases concerning oral contracts, then, the trial court's findings as to the

11

intent of the contracting parties and its ultimate judgment should not be set aside unless it is against the manifest weight of the evidence. *Id.* "A [finding or] judgment is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the finding is unreasonable, arbitrary, or not based on the evidence presented." *In re Estate of Bennoon*, 2014 IL App (1st) 122224, ¶ 70.

¶ 39    To allege the existence of a valid and enforceable contract, "a plaintiff must plead facts indicating there was an offer, an acceptance, and consideration." *Talbert v. Home Savings of America, F.A.*, 265 Ill. App. 3d 376, 380 (1994). A valid and enforceable contract also requires a "meeting of the minds or mutual assent as to the terms of the contract." *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 313 (1987). However, "[i]t suffices that the conduct of the contracting parties indicates an agreement to the terms of the alleged contract. [Citations.] Otherwise, a party would be free to avoid his contractual liabilities by simply denying that which his course of conduct indicates." (Internal quotation marks omitted.) *Id.* at 313-14.

¶ 40    Here, Mr. Fernandez argues, for the first time on appeal, that there was no valid offer or acceptance because "important and necessary terms were not definite or communicated to the other party so that mutual agreement as to the terms could be met." First, as noted above, Mr. Fernandez, having never argued this at trial, has forfeited this theory of defense. *Daniels*, 162 Ill. 2d at 58. Moreover, this defense fails on the merits.

¶ 41    Conduct of the parties can indicate agreement to the terms (*Midland Hotel Corp.*, 118 Ill. 2d at 313-14) and the trial court found that Mr. Fernandez continued to pay ARC based on the hourly wages Mr. Huerta testified to and also continued to do so after the $120,000 "limit" was met. The trial court's finding as to the agreed upon contract terms is clearly supported by the evidence.

¶ 42     To the extent that Mr. Fernandez is relying on his own testimony that there was no agreement between the parties or that the agreement was only to pay $120,000, "[w]e give great deference to the trial court's credibility determinations" and such determinations will not be reversed unless they are against the manifest weight of the evidence. *Vician v. Vician*, 2016 IL App (2d) 160022, ¶ 30. The trial court found Mr. Huerta to be more credible than Mr. Fernandez. This credibility determination is not "arbitrary, unreasonable, or not based on the evidence" (*id.*) where Mr. Huerta's testimony was supported by his hourly time records and Mr. Fernandez paid ARC according to the specified hourly breakdown, reimbursed ARC for materials and subcontractor fees, and continued to do so after the parties reached the $120,000 threshold.

¶ 43     Mr. Fernandez argues that the contract between the parties needed to be in writing to be valid under section 1 of the Statute of Frauds (740 ILCS 80/1 (West 2016)). The trial court held that Mr. Fernandez failed to raise the Statute of Frauds as an affirmative defense and that, regardless, it would fail on the merits because the contract could be performed within a year. Mr. Fernandez maintains his allegation of "fraud and illegality" as an affirmative defense was an allegation of a violation of the Statute of Frauds. Alleging fraud generally, however, is not the same as alleging a violation of the Statute of Frauds.

¶ 44     The elements of common law fraud are: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co., Ltd.*, 174 Ill. 2d 482, 496 (1996).

¶ 45     Section 1 of the Illinois Frauds Act, also known as the Statute of Frauds, states in relevant part:

13

"No action shall be brought *** upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized." 740 ILCS 80/1 (West 2016).

¶ 46     Manifestly these are different concepts requiring different allegations. We agree with the trial court that Mr. Fernandez has forfeited this claim and that by pleading fraud he did not assert that the Statute of Frauds was violated.

¶ 47     Moreover, the trial court is correct that, even if there was no forfeiture, this claim would fail. As ARC and the trial court both point out, the test under the Statute of Frauds is not whether the contract *was* completed in a year, but whether the contract *could be* completed within one year. *Gilliland v. Allstate Insurance Co.*, 69 Ill App. 3d 630, 632-33 (1979). The trial court found it to be quite possible that the contract could have been completed within a year, citing the testimony at trial that ARC completed the physical labor on the Wolcott Property in 2014. Mr. Fernandez makes no argument that this finding was against the manifest weight of the evidence.

¶ 48     Mr. Fernandez also argues that the contract was required to be in writing to be enforceable under section 15 of the Remodeling Act. Mr. Fernandez is raising this argument for the first time on appeal and has therefore forfeited it. *Daniels*, 162 Ill. 2d at 58. And, furthermore, even if it were not forfeited, it would also not require reversal in this case.

¶ 49     Section 15 of the Remodeling Act states:

"Prior to initiating home repair or remodeling work for over $1,000, a person engaged in the business of home repair or remodeling shall furnish to the customer for signature a written contract or work order that states the total cost, including parts and materials listed

with reasonable particularity and any charge for an estimate." 815 ILCS 513/15 (West 2016).

¶ 50    Mr. Fernandez argues that because the parties engaged in home remodeling work for more than $1,000, the contract was required to be in writing to be valid. In support of this argument, Mr. Fernandez cites a Rule 23 order—*Roberts v. Adkins*, No. 3-09-0187 (2011) (unpublished order under Illinois Supreme Court Rule 23)—and two overruled cases—*K. Miller Construction Co. v. McGinnis*, 394 Ill. App. 3d 248 (2009), and *Smith v. Bogard*, 377 Ill. App. 3d 842 (2007). Rule 23 orders are "not precedential and may not be cited by any party except to support contentions of double jeopardy, *res judicata*, collateral estoppel or law of the case." Ill. Sup. R. 23(e)(1) (eff. April 1, 2018). Those exception clearly do not apply here.

¶ 51    *K. Miller Construction* was appealed to our supreme court, and the supreme court reversed the appellate court's decision—while also overruling *Smith*—and explicitly held that violation of section 15 of the Remodeling Act does not automatically render a contract unenforceable. *K. Miller Construction Co. v. McGinnis*, 238 Ill. 2d 284, 297 (2010). Rather, the court determined that "the [Remodeling] Act left it an open question as to whether a statutory violation rendered an oral contract unenforceable" and the court should "conduct[ ] a balancing analysis and consider[ ] the relevant facts and public policies before concluding that [a] plaintiff could not pursue relief for breach of contract." *Id.* at 297-98. Here, Mr. Fernandez has made no argument for why a balancing analysis should come out in his favor and we will not supply one for him, especially considering that he has forfeited this issue on appeal. See, *e.g.*, *Wing v. Chicago Transit Authority*, 2016 IL App (1st) 153517, ¶ 11 (an appellant must make arguments that are supported by citations to authority in order to avoid procedural default).

¶ 52                    2. ARC Fully Performed Under the Contract

¶ 53    Mr. Fernandez next argues that ARC did not fully perform because it did not adhere to the blueprints and "aspects of the rehab were not performed properly," particularly referring to the fact that a different heating unit and a different type of flooring from those indicated in the blueprints or requested by Mr. Fernandez were installed.

¶ 54    "The general rule is that a builder is not required to perform perfectly, but rather is held only to a duty of substantial performance in a workmanlike manner." *J.R. Sinnott Carpentry, Inc. v. Phillips*, 110 Ill. App. 3d 632, 675 (1982). "[S]ubstantial performance means performance in all the essential elements necessary to accomplish the purpose of the contract." *W.E. Erickson Construction, Inc. v. Congress-Kenilworth Corp.*, 115 Ill. 2d 119, 127 (1986). Whether a party substantially performed is a question of fact that will not be disturbed unless it is against the manifest weight of the evidence. *Id.*

¶ 55    Here the purpose of the contract was to perform a remodeling of the Wolcott Property. ARC completed a full remodel, spending over $200,000 on labor and materials, that passed city inspection. It installed a different heating unit than the blueprint specified, however, the evidence showed that the unit was installed at the direction of Mr. Fernandez's son. As to the flooring, the trial court deducted the cost of repair from the award, and Mr. Fernandez makes no argument that the defects in the flooring thwarted the purpose of the contract. Accordingly, the trial court's determination that ARC substantially performed its obligations under the contract was not against the manifest weight of the evidence.

¶ 56                    3. Mr. Fernandez Breached the Contract

¶ 57    Mr. Fernandez argues that he did not breach because he paid $175,180.00 and ARC "never introduced any testimony or evidence showing that Mr. Fernandez failed to pay according to the

16

terms." His argument, which contains no citation to authority, ignores the trial court's determination, based on stipulated evidence, that ARC spent $214,9008.67 on materials, labor, and subcontractors to complete the Wolcott Property remodeling, that Mr. Fernandez paid $175,180, and that he owed the difference based on the terms of the contract describe above, after subtracting for deficient performance. The trial court's finding that Mr. Fernandez breached was not against the manifest weight of the evidence. *Timan v. Ourada*, 2012 IL App (2d) 100834, ¶ 24 (whether a party breached a contract is a factual question and will not be disturbed unless it is against the manifest weight of the evidence)

¶ 58                    4. There is No Evidence that ARC Failed to Mitigate

¶ 59    Mr. Fernandez next argues ARC "did not mitigate its damages and therefore is not entitled to [the] judgment award." Mr. Fernandez does not direct this court to any facts to support this argument but instead just lists general principals of law. "A reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. The appellate court is not a depository in which the appellant may dump the burden of argument and research." (Internal quotation marks omitted.) *Gandy v. Kimbrough*, 406 Ill. App. 3d 867, 875 (2010). Mr. Fernandez simply points this court to look in "subsection ii" of its brief for an explanation of how ARC failed to mitigate. The only mention of mitigation there is that the "failure to present a final bill and instead pursue this litigation not only shows that [Mr. Fernandez] did not breach any 'contract' but also goes to [Mr. Fernandez's] affirmative defense of failure to mitigate damages." Mr. Fernandez's contention that ARC failed to mitigate is simply unsupported on appeal.

¶ 60            B. The Damages Awarded to ARC Were Supported by the Evidence

¶ 61    Mr. Fernandez next argues that the trial court's award was against the manifest weight of

17

the evidence because it failed to account for all the defects in performance when awarding damages. Again, we disagree.

¶ 62    A trial court's award of damages will not be reversed unless it is against the manifest weight of the evidence. *Doornbos Heating and Air Conditioning, Inc. v. James D. Schlenker, M.D., S.C.*, 403 Ill. App. 3d 468, 485 (2010). "A damage award is against the manifest weight of the evidence only where it is apparent that the trial court ignored the evidence or that its measure of damages was erroneous as a matter of law." (Internal quotation marks omitted.) *Id.*

¶ 63    Here, the trial court based its award on the exhibits the parties jointly submitted and the testimony of the witnesses. Based on that evidence, it calculated that ARC spent $214,908.67 on labor and materials and Mr. Fernandez paid $175,180, leaving a balance of $39,728.67. The court then considered whether ARC's unworkmanlike performance of various aspects of the remodel warranted a deduction, specifically considering the toilets, the heating unit, the tuckpointing, the floors, and the back porch. The court determined that there was insufficient evidence to show unworkmanlike performance by ARC as to the toilets, the heating unit, and the tuckpointing. However, the court found that both the floors and back porch were installed in an unworkmanlike manner and deducted a total of $10,900 based on an estimate of the cost to replace the floors and install a new back porch.

¶ 64    Mr. Fernandez argues "[a]side from the flooring and deck, the trial court failed to consider and take into account the other problems—toilet leakage, cabinets not level and not closing, window issues, etc." It is true that the trial court did not address every potential defect cataloged by Mr. Fernandez and his son Antonio at trial. However, it is well settled that "[a] court need not explicitly mention every piece of evidence that it considers in reaching its decision" (*Young v. Herman*, 2018 IL App (4th) 170001, ¶ 68) and nothing indicates the court was anything other than

18

careful and considerate.

¶ 65    Mr. Fernandez further argues that the trial court erred in failing to deduct from the damages expenses ARC charged Mr. Fernandez during the remodel that Mr. Fernandez now argues he should not have had to pay. Specifically, he directs us to a receipt for one package of toilet paper, gas for Mr. Huerta's truck, office supplies, payments made to Mario Juarez and Manuel Herrera for work billed at $35 and $30 an hour, respectively, cash payments to Mr. Ballesteros's uncle, and the cost of the architect and permits.

¶ 66    The parties stipulated to the expenses ARC submitted at trial and the court determined the total expenses ARC incurred based on the stipulated evidence. Nothing in the record indicates that those expenses, some of which Mr. Fernandez—as the "ultimate decision maker"—paid as early as 2013, were not payments both parties agreed to. No testimony regarding the receipts for toilet paper, gas, or office supplies or the wages of Mr. Juarez and Mr. Herrera was elicited at trial and Mr. Fernandez did not argue they were impermissible expenses until this appeal. As to the cash payments to Mr. Ballesteros's uncle, Mr. Huerta testified he wrote those down simply to "tell Mr. Fernandez *** [he] paid [Mr.] Ballesteros *** and [Mr. Ballesteros] paid his uncle." There is conflicting testimony on whether ARC intended to expense the cost of the architect or the permits. While Mr. Huerta said at trial that he retained the architect and got the permits for the Wolcott Project as a "favor," he clearly charged Mr. Fernandez for the architect and Mr. Fernandez himself testified at trial that the permits were part of the original agreement. Accordingly, the trial court's award of damages is not against the manifest weight of the evidence.

¶ 67     C. The Trial Court Did Not Err in Denying Mr. Fernandez's Motion for a Directed Finding

¶ 68    Finally, Mr. Fernandez argues that ARC did not present *prima facie* evidence of a valid contract and the trial court's failure to grant his motion for a directed finding on this basis was in

error. Following a motion for directed finding, a trial court's determination, after weighing the evidence, that a plaintiff has made a *prima facie* case will not be set aside unless it is against the manifest weight of the evidence. *Minch v. George*, 395 Ill. App. 3d 390, 398 (2009). As discussed above, ARC presented sufficient evidence at trial that a valid and enforceable contract was formed between the parties and that neither the Statute of Frauds (740 ILCS 80/1 (West 2016)) nor section 15 of the  Remodeling Act (815 ILCS 513/15 (West 2016)) bars the enforceability of that contract. Therefore, the trial court's denial of Mr. Fernandez's motion for a directed verdict was not against the manifest weight of the evidence.

¶ 69                                    IV. CONCLUSION

¶ 70    For the reasons stated above, we affirm the judgment of the trial court.

¶ 71    Affirmed.